**In re CROWN AUTO DEALERSHIPS, INC., Debtor.**

**Bankruptcy No. 93–11864–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 16, 1995.

Russell M. Blain, Tampa, FL, for Debtor.

Daniel J. Herman, Largo, FL, for Claimants.

## ORDER ON OBJECTIONS TO CLAIMS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case filed by Crown Auto Dealerships, Inc., d/b/a Crown Daihatsu, d/b/a Crown Honda, d/b/a Crown Nissan, d/b/a Crown Suzuki, d/b/a Crown Ferrarri, d/b/a Crown Jaguar, d/b/a Crown Pontiac–GMC Truck (Crown). Crown filed its Voluntary Petition for Relief under Chapter 11 on November 12, 1993, and currently is operating its business as debtor-in-possession. Crown has filed a proposed Plan of Reorganization which is awaiting confirmation.

On April 6, 1994, John Beil, Betty Moll, John Bonanno, Raymond Brosan, Brian Moran, Anna Russell, and Randy R. & Maria C. Bell (collectively referred to as Claimants) filed their initial proofs of claim. These initial claims were not filed in any specific amount, and the claims stated only that they were based on the "fraudulent sale of previously stolen car[s] as new." Crown subsequently filed a written objection to these claims on several grounds, including the ground that the claims are facially defective since no amount is shown on the proofs of claim. Crown combined its objection with a Motion and sought to liquidate or estimate the claims filed by the Claimants. Crown's objection was considered in due course, and this Court entered an order sustaining the objection and disallowing the claims without prejudice to the Claimants' right to file amended claims. The initial bar date was extended to October 17, 1994, and on October 13, 1994, the Claimants filed their amended proofs of claim which were assigned the following claim numbers:

| Claimant | Claim No. | Amount of Claim compensatory/punitive | |
|---|---|---|---|
| Bell | 126 | $18,500 | $500,000 |
| Beil | 127 | $10,000 | $500,000 |
| Bonanno | 128 | $10,500 | $500,000 |
| Brosan | 129 | $11,500 | $500,000 |
| Moll | 130 | $10,000 | $500,000 |
| Moran | 131 | $19,985 | $500,000 |
| Russell | 145 | $16,800 | $500,000 |

The attachment to all the amended proofs of claim indicate that the claim is based on a jury award in the state court case and is based on a claim that the Claimants purchased an automobile which was sold to them as new when in fact the automobile in question was stolen and recovered. It should be noted at the outset that Crown's objection to the claim of Moll has been sustained and this claim was disallowed in toto during the trial.

In this connection it should be pointed out that none of these claimants, with the exception of Mr. and Mrs. Bell, have actually had their claims tried in the state court. Mr. and Mrs. Bell's lawsuit, styled *Randy R. Bell and Maria C. Bell v. Crown Pontiac, Inc.*, Case No. 86–14162–16, filed in the Sixth Judicial Circuit in and for Pinellas County, Florida, has been tried twice. In the first trial, the jury returned a verdict in favor of the Bells and awarded punitive damages to the Bells in the amount of $100,000. The judgment entered on this verdict was reversed on appeal, however, on the basis that the Bells had failed to prove that they had suffered actual damages. The case was tried by a jury for the second time in 1993, and the jury in this second trial awarded the Bells $500,000 in punitive damages. This jury verdict and the judgment entered on the verdict were subsequently set aside by the trial judge, however, based on substantial evidence of juror misconduct. It is without dispute that there is currently no valid jury verdict or judgment in existence either in favor of the Bells or in favor of any of the other claimants. The only claimant who actually filed a lawsuit other than Mr. and Mrs. Bell was Ms. Russell, and Ms. Russell's action was stayed prior to trial by virtue of the intervening Chapter 11 case.

None of the amended claims are supported by any documentation other than a narrative setting forth the basis for the claim. Crown filed a renewed objection to the allowance of the amended claims based on the contentions that (1) none of the amended claims reflect that the Claimants suffered any actual damages; (2) the claims for punitive damages are unsupported; (3) punitive damages are not allowable under the Bankruptcy Code; and, (4) even if punitive damages are allowable, this record would not sustain a claim for that type of award sought by the Claimants against Crown.

At the pretrial conference on the renewed objection, the Court announced that it would bifurcate the trial and initially try only the issue of liability and actual damages, if any, suffered by these Claimants. The Court

would then consider whether the imposition of punitive damages is appropriate under nonbankruptcy law only if actual damages were established during the first phase of the trial. In the pretrial order the Court also specified that, if it finds that punitive damages are appropriate under nonbankruptcy law, it will consider (1) whether principles of equity require subordination or total disallowance of the punitive damages claim; (2) whether the allowance of the punitive damages claim would impair the claims of any other creditors; and (3) if so, whether such impairment applies to all creditors or only some creditors or classes of creditors.

At the duly scheduled trial, which was limited to the issue of liability vel non of Crown for compensatory damages in accordance with the Pretrial Order, the following relevant facts were established.

### AMENDED CLAIM # 126 OF MR. AND MRS. BELL

Mr. and Mrs. Bell purchased a 1984 Trans Am Ricardo automobile from Crown on March 25, 1984. The purchase price for the vehicle was $18,500. The Bells paid $9,000 down, which amount included a used car allowance, and financed the balance of the purchase price through a bank loan. The vehicle had 3,500 miles on the odometer at the time that the Bells purchased it on March 25, 1984. The vehicle was sold to the Bells as a "new demonstrator," a term used by Crown. (T–75). The Bells were told that the manager or president of Crown had driven the vehicle (T–71, Lines 6 and 8), and no agent or representative of Crown ever told them that the vehicle had been stolen prior to the purchase. (T–72, Line 23). Shortly after the purchase in 1984, the Bells experienced an engine overheating problem and demanded either a new car or their money back, but Crown refused. (T–79, Line 19–23). The Bells then continued to use the vehicle until 1986. At that time, the Bells had continued mechanical problems with the vehicle, and they learned that the vehicle had not been a demonstrator, but instead had been stolen from Crown's premises between December 17 and December 20, 1983, and was not recovered until January 22, 1984. By 1986, the vehicle had 26,000 miles on the odometer. Crown recommended certain repairs on the vehicle, which Mrs. Bell refused and again demanded either a new car or the return of their money. An employee of Crown noted on the service order that the car was "unsafe to drive." (T–81, 83, 91).

It appears that after the Bells refused to have the car repaired they stopped using the automobile and attempted to assert a claim under the "Lemon Law" against Crown and General Motors Corporation. This claim was unsuccessful for reasons not evident from the record. It is without dispute that the Bells never rented an automobile as a substitute vehicle. At the time of the commencement of this Chapter 11 case, the Bells were still in possession of the automobile but ultimately sold the vehicle for salvage in 1995 for the sum of $700.

### AMENDED CLAIM # 145 OF ANNA RUSSELL

Ms. Russell purchased a 1984 Trans Am from Crown on August 30, 1984. The purchase price for the vehicle was $16,997. (Claimants' Exhibit 13). Ms. Russell paid $200 down and financed the balance of the purchase price.

The vehicle was sold to Ms. Russell as a new demonstrator. (T–26, Lines 23–24). Ms. Russell was told that the vehicle had been driven by sales people employed at Crown. At the time of the purchase, the vehicle had 5,770 miles on the odometer. (Claimants' Exhibit 14). Ms. Russell had some mechanical problems with the vehicle and took the car back to Crown several times, but claims that the car was never permanently repaired. (T–54, Lines 15–25; T–55, Lines 1–5).

Ms. Russell drove the vehicle from August of 1984 until 1988. During this period, she put more than 77,000 miles on the car. It appears that she drove the car approximately 72,000 miles, and then gave it to her uncle who drove it an additional 23,000 miles.

Ms. Russell learned that the car had been stolen from an investigator hired by the attorney representing the Claimants and recovered prior to when it was sold to Ms. Russell. Specifically, the vehicle was stolen between December 17 and December 20,

1983, and recovered on January 21, 1984, according to the theft report filed with the Police Department. (Claimants' Exhibit 2). It further appears that, prior to the sale of the vehicle to Ms. Russell, the vehicle required twelve separate repairs. (Claimants' Exhibit 49, which summarized composite Exhibit 47). There is no evidence that any of the repairs or mechanical problems with the car were related in any way to the prior theft of the vehicle.

Upon learning of the history of the car, Ms. Russell did not seek any redress from Crown at that time, and did not assert any claim until she filed her proof of claim in this Chapter 11 case. Ms. Russell is still in possession of the vehicle, although she has placed it in storage. She has indicated that she is willing to return the vehicle to Crown. This offer, of course, means that the car would be returned in its present condition and with its present mileage.

### AMENDED CLAIM # 131 OF BRIAN MORAN

Mr. Moran purchased a Trans Am from Crown on July 3, 1987. The purchase price of the vehicle was $19,985. At the time that Mr. Moran purchased the vehicle, it had 1,850 miles on the odometer. Mr. Moran, however, believes that the vehicle had only 800 to 900 miles on the odometer. (T–105–118). Mr. Moran drove the automobile for approximately 12,000 miles and experienced no problems with the engine or other operating components of the car. It appears that the only difficulty with the car concerned the roof. Mr. Moran had requested a special roof on the vehicle, and Crown sent the vehicle to an outside custom shop for installation of a targa top as requested by Mr. Moran. (T–108). Mr. Moran was aware that the special top would be installed by a custom shop not located on Crown's premises. The special top and louvers were installed. The roof leaked, however, and Mr. Moran traded the vehicle at Crown for a new Toyota pick-up truck. He received a trade-in allowance for the Trans Am in the amount of $10,605. At the time of the trade-in the Trans Am had 13,000 miles on it. (T–110, Lines 5–10; T–111, Lines 2–4; T–112, Lines 13–17).

Prior to the purchase of the vehicle by Mr. Moran, an incident occurred which caused the vehicle to be out of Crown's control for between one and three days. (T–116). It appears that a potential customer of Crown took possession of the vehicle with the representation that he was interested in purchasing it. The potential customer attempted to trade in a stolen vehicle in connection with the purchase, however, and then refused to immediately return the Crown vehicle to the dealership. While the car was in the potential customer's possession, Crown reported the vehicle as stolen.

### AMENDED CLAIM # 129 OF RAYMOND BROSAN

Mr. Brosan and his wife purchased a 1981 Pontiac Grand Prix from Crown as a demonstrator in 1981. At the time of the purchase the vehicle had 11,400 miles on the odometer. (T–236, Lines 2–7). There is no evidence in this record that the car was ever stolen or, if it was stolen, there is no evidence regarding the details of the theft. Nevertheless, Mr. Brosan claims that he learned in 1993 that the car had been stolen prior to the time that he purchased it. Mr. Brosan, who is now deceased, testified at the original trial in the state court that, had he known the car was stolen, he never would have bought it. (T–242, Line 17–25). Mr. Brosan had already traded the vehicle for another car by 1993 when he contends that he learned of the prior theft.

### AMENDED CLAIM # 127 OF JOHN BEIL

Mr. Beil purchased a 1982 Fiat convertible from Crown in 1984 for the purchase price of $10,000. At the time of the purchase, the vehicle had 7,120 miles on the odometer. Notwithstanding this mileage, the car was sold to Mr. Beil as a new demonstrator. Mr. Beil kept the vehicle until 1986 when he sold it for $2,000.

### AMENDED CLAIM # 128 OF JOHN BONANNO

Mr. Bonanno purchased a 1987 Pontiac Phoenix from Crown for the purchase price of $10,500. At the time of the purchase, the vehicle had 50–100 miles on the odometer. The vehicle was reported to have been stolen

on September 29, 1987. (Claimants' Exhibit 5). The vehicle was recovered two months later. It appears that Mr. Bonanno drove the car for 50,000 miles and experienced no mechanical problems with the car during most of this use. Mr. Bonanno ultimately sold the vehicle and stated that he received "what the car was worth" when he sold it. Mr. Bonanno did not learn that the car had been a recovered vehicle until 1993, years after he had sold it. Mr. Bonanno seeks compensatory damages of $10,500, the amount he allegedly paid for the vehicle.

## OTHER PURCHASERS

The Claimants also introduced into evidence the testimony of other car buyers who have not asserted any claims in this case. Although this testimony was introduced in an effort to show an alleged pattern of fraudulent conduct, no clear pattern in fact emerges. Instead, the evidence only revealed that in some instances the cars purchased by the customers had not actually been stolen and recovered before the purchase, and that in most instances the customers were generally satisfied with their vehicles.

## EXPERT TESTIMONY

The Claimants presented an automobile dealer as an expert witness. This witness testified that automobiles experience a 50% to 60% reduction in value if they are stolen and a theft report is issued on the car as a result of the incident. The expert did not furnish any empirical data to support this conclusion or explain the method by which he calculated these figures. Further, the expert acknowledged that neither the NADA book nor the "black book" include the prior theft of a vehicle as a factor contributing to the value of that vehicle.

In opposition, Crown also presented an automobile dealer as an expert witness. Crown's expert provided specific testimony regarding the duty of a dealer to disclose the prior theft of a vehicle. He testified that (1) none of the documents which are required to transfer the ownership of an automobile in the State of Florida require disclosure that a vehicle may have been stolen and recovered; (2) there is no requirement to inform a lend-er that the dealer has a recovered vehicle available to sell to a consumer; and (3) there is no law or regulation that requires a dealer to inform a customer that a car is a recovered vehicle. The expert also testified that there is no industry practice or ethical code which requires such disclosure, and that a recovered vehicle with no damage would typically be returned to the dealer's inventory and sold in the normal course of business as a matter of industry practice.

Crown's expert also testified as to the factors which generally determine the value of a car in the market. These factors are: (1) the characteristics of the specific automobile, including its make, model, color, and supply and demand; (2) the mileage on the automobile; and (3) the physical condition of the automobile.

Finally, Crown's expert testified that a car with an open Manufacturer's Statement of Origin (MSO) by definition has not yet been titled, and therefore must be sold either as a new car or a demonstrator. It is undisputed that all of the automobiles purchased by the Claimants had never been titled and therefore were sold to the Claimants with open MSOs.

The final expert presented in this case was an automobile insurance expert. This expert testified that (1) an insurance company makes no payment for a stolen vehicle that is recovered within thirty days with no damage, and (2) an insurance company is not required by any law or regulation to inform a buyer that a recovered vehicle is being sold.

## DISCUSSION

Based on this evidence, the Claimants contend that they are entitled not only to an award of compensatory damages, but also to an award of punitive damages based on the alleged egregious conduct of Crown. Claimants' evidence indicates that the automobiles that they purchased were either (1) actually stolen and recovered prior to their purchase by the Claimants, or (2) the subject of theft reports issued as a result of mistake, misunderstanding, or other unusual circumstances. It also appears that the thefts or theft reports were not disclosed to the Claimants

prior to their purchase of the vehicles. The amended claims are based solely on the allegation that previously stolen cars were fraudulently sold as new.

The ultimate question, therefore, is whether either common law or a specific statute imposed an affirmative duty on Crown to disclose the fact that the automobiles in question were stolen and recovered. The expert testimony presented in this case indicates that no law requires any notation on a vehicle's Certificate of Title that the vehicle has ever been stolen, even though Florida law does require such a notation when the car is a used or rental vehicle. Consequently, the question is whether the failure to disclose the theft amounts to actionable fraud.

## COMMON LAW FRAUD

■ It is fundamental that four elements must be present in order to establish a claim based on fraud in Florida: (1) the claimant must show that the defending party made a false statement concerning a material fact; (2) the claimant must show that the defending party either knew the statement was false or should have known of its falsity; (3) the claimant must show that the defending party intended for the representation to induce action; and (4) the claimant must show resulting damage, or that he justifiably relied on the representation to his detriment. *Wright v. Leasecomm,* 817 F.Supp. 106, 108 (M.D.Fla.1993). Each of these elements must be established in order for the claimant to prevail. Further, the burden of proof is on the Claimants in this case to establish each of the elements of their claim. Where a party presents a colorable objection to a claim, sufficient to overcome the prima facie validity of the claim granted by Section 502(a) and Rule 3001(f), the claimant bears the ultimate burden of persuasion. *In re Katz,* 168 B.R. 781, 788 (Bankr.S.D.Fla.1994). The claimant at all times has the ultimate burden of persuasion with regard to its claim. *In re Romano,* 175 B.R. 585, 599 (Bankr.W.D.Pa.1994).

■ This Court is satisfied that the Claimants have failed to satisfy their burden of proof with respect to the first element re-

quired in a claim for common law fraud. Specifically, the Claimants failed to establish that Crown made any false statement concerning a material fact. The Claimants apparently assert that the false statements made by Crown consist of the representations that the cars that they purchased were "new" cars. According to the Claimants, such a representation evidently includes the additional implied meaning that the cars were never outside of Crown's control after delivery to the dealership. The Court concludes that the Claimants failed to prove that Crown's representations constitute actionable false statements for at least two reasons.

■ First, there is no evidence in this record that Crown expressly stated that the cars were "new." Instead, it appears that in most instances the cars were presented as demonstrators or "new demonstrators," and the odometer reading on most of the cars was consistent with previous use. There is no writing which evidences any representation by any employee of Crown that the cars had not been driven previously, and the Claimants' testimony concerning the specific representations made by Crown's salespeople did not establish any such representation. To prove a cause of action based on fraud, there must be clear evidence that a false statement was actually made. Absent such clear evidence, the claim must fail.

Relatedly, even if Crown had clearly represented that the cars were new, such a representation would not technically be false. None of the cars sold to the Claimants were previously titled to any other parties, and all of them were sold to the Claimants with open MSOs.

■ Secondly, this Court finds that the Claimants did not prove that Crown made materially false statements by silence regarding the vehicles because Crown had no affirmative duty to disclose the prior thefts or theft reports. This Court was unable to find any statute or regulation or other authority which creates such a duty, and none of the expert witnesses which testified for either party identified any statute or regulation which imposes the duty to disclose to a buyer that a vehicle was stolen and recov-

ered before the sale. In fact, when specifically questioned on this issue, all of the expert witnesses testified that there is no statute or regulation which requires automobile dealers to inform a customer that a vehicle has been stolen and recovered. The experts also testified that the industry practice generally is to return recovered vehicles to a dealer's inventory and selling them in the ordinary course of business either as demonstrators or used vehicles. It is well-settled that the failure to disclose material information may constitute actionable fraud in circumstances in which there is a duty to disclose that information. Where there is no duty to disclose, however, the omission does not amount to a fraudulent "representation." *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114–15, 63 L.Ed.2d 348 (1980). Claimants did not establish that Crown made any false statements concerning a material fact and had a duty to disclose that the vehicles sold were stolen but recovered, thus failed to establish a actionable claim based on common law fraud.

■ The Court is also satisfied that the Claimants did not prove that they justifiably relied on any representations allegedly made by Crown. Again, the Claimants are complaining that Crown represented that the cars that they purchased were "new" cars, even though the cars previously had been stolen.

There is no evidence in this record that warrants a finding that any representative of Crown ever told any of the Claimants that the vehicles were "new." The most that could be said that they were sold that the vehicles were "new demonstrators." There is no evidence that any of the odometers were rolled back and it is hard to accept the proposition that a vehicle with as much as 5,770 miles on it could be considered a new vehicle. It is significant that the Claimants are *not* alleging that the cars were damaged when they were recovered, and there is absolutely no evidence in this record that the cars were in fact damaged as a result of the thefts. The Claimants' sole complaint is that they were not told that the cars were recovered vehicles, even though the condition of the vehicles was not impaired.

The Court concludes, therefore, that the Claimants failed to prove any claim based on common law fraud because they failed to establish at least two elements necessary for the cause of action: (1) that Crown made any false statement concerning a material fact, or (2) that the Claimants justifiably relied on any such misrepresentation to their detriment.

## DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

As set forth above, the Claimants only alleged in their Amended Claims that previously stolen cars were fraudulently sold as new, a theory apparently based on common law fraud. No statutory basis for the claims was asserted. Nevertheless, at the conclusion of the trial, the Claimants also contended that Crown violated the Florida Deceptive and Unfair Trade Practices Act. Section 501.201 *et seq.,* Fla.Stat.

Section 501.204 of the Florida Statutes provides that any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are declared unlawful. The statute was amended in 1986 to add a section entitled "Sale of used goods as new." Section 501.2045, Fla.Stat. That section provided that it was unlawful for a seller in certain consumer transactions to misrepresent orally, in writing, or *by failure to speak* (emphasis supplied), that the goods are new or original when they are used, repossessed, or where they have been used for sales demonstration. This new Section was repealed in 1993. The stated purpose of the Statute was, of course, to protect consumers from suppliers who commit unfair and deceptive trade practices. Section 501.202(2), Fla.Stat.

■ This statutory basis for Claimants' claims constitutes a new theory or a new cause of action which was not asserted until after the bar date for filing claims had passed. Consequently, the new theory of action is technically untimely and should not be allowed. *In re International Horizons,* 751 F.2d 1213 (11th Cir.1985); *In re Patrick,* 96 B.R. 358 (Bankr.M.D.Fla.1989). Even if

this theory of action were timely, however, this Court is satisfied that the Claimants could not prevail under the statute for the following reasons:

First, it appears that Section 501.2045, regarding the sale of used goods as new, may not apply to the transactions at issue in this case. As stated above, this Section was added to the Act in 1986 and repealed in 1993. Many of the purchases involved in this case, however, occurred before 1986 and therefore at a time when the Section was not in effect. Further, it is clear that an actual misrepresentation must have occurred in order to be entitled to relief under Section 501.2045. For the reasons described above, this Court is satisfied that Crown did not make any actual misrepresentations concerning the status of the vehicles. Instead, Crown's representatives informed the Claimants that the cars had been driven, did not alter the mileage on the odometers, and had no duty to disclose that the cars were recovered vehicles. Additionally, the cases reported under Section 501.2045 involve situations in which the goods had been *damaged*, and the damage was not disclosed to the customer. There is no evidence in this case of any damage to the vehicles which resulted from the thefts or other incidents with the cars.

Finally, as to Section 501.204 of the Florida Statutes, although it appears that this provision may not require proof of actual fraud, the consumer must prove that the seller engaged in "unfair or deceptive acts or practices" in order to be entitled to relief. The seller's conduct must be unfair or deceptive, and the consumer must be aggrieved *by the deception.* See *Klinger v. Weekly World News, Inc.,* 747 F.Supp. 1477 (S.D.Fla.1990). (emphasis supplied). The concept of "unfair or deceptive acts" is not clearly defined, but some cases have suggested that the conduct must offend established public policy and be "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Urling v. Helms Exterminators, Inc.,* 468 So.2d 451, 453 (Fla. 1st DCA 1985), citing *Spiegel, Inc. v. Federal Trade Comm.,* 540 F.2d 287, 293 (7th Cir.1976).

In this case, Crown's conduct was not unfair or deceptive within the meaning of Section 501.204. The vehicles were not damaged, and there is no evidence that the vehicles were defective as a result of the thefts. Nor is there any evidence in the record that Crown had any reason to believe that the vehicles were defective at the time that they were sold to the Claimants. In fact, the Claimants do not even contend that the prior thefts materially affected their use of the automobiles or that Crown misled them as to the condition of the cars or their potential enjoyment of the cars. Under these circumstances, coupled with the absence of any affirmative duty to disclose the thefts, this Court is satisfied that Crown did not engage in any unfair or deceptive practices within the meaning of the statute, and the Claimants have failed to establish any claim under the Florida Deceptive and Unfair Trade Practices Act.

### DAMAGES

Even if the Claimants had proven all of the primary elements to establish either common law fraud or a violation of Florida's Deceptive and Unfair Trade Practices Act, a final hurdle was necessary to overcome in order to be entitled to an allowable claim in this case, and that is damages. However, this record of devoid of evidence of damages suffered by the claimants. Claimants seek to recover the purchase price that they paid for their respective automobiles, as well as punitive damages based on Crown's alleged egregious conduct.

There is absolutely no evidence that the cars were damaged when they were stolen or involved in the other incidents. Further, there is absolutely no evidence that any problems with the vehicles were in any way related to the thefts or the prior incidents with the cars. In fact, there is little evidence that the Claimants experienced any serious difficulties with their cars, and in most instances the Claimants drove their vehicles for a number of years until they eventually traded or sold them for unrelated reasons.

The only evidence which even approaches proof of actual damages is the testimony of the Claimants' expert witness regarding a

perceived decrease in the value of the cars merely because they were recovered vehicles, with no independent showing of harm or wear and tear on the cars. The Court expressly rejects this testimony as totally unsubstantiated, inconsistent with other indicators of value, and inconsistent with established publications on the value of automobiles.

■ This Court is satisfied that the Claimants received the vehicle that they bargained for and that they also received the use value of the vehicle that they bargained for. The Claimants are not entitled to the allowance of any claim based on actual damages, since they failed to establish that they suffered any actual damages as a result of Crown's representations concerning the vehicles. Claimants' subjective feelings of disappointment are insufficient to form the basis of an award of actual damages.

■ Finally, it is well-established under Florida law that punitive damages are recoverable only where actual damages are shown. *Martin v. United Security Services, Inc.*, 314 So.2d 765, 772 (Fla.1975), cited in *Stinson v. Feminist Women's Health Center*, 416 So.2d 1183, 1185 n. 1 (Fla. 1st DCA 1982). Since no actual damages were shown in this case, Florida law does not permit any award of punitive damages.

In view of the foregoing, the Debtor's objections to the Amended Claims of the Claimants should be sustained, and the Amended Claims filed by the Claimants should be disallowed in their entirety.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection to Claim # 126 filed by the Debtor is hereby sustained and Claim # 126 is hereby disallowed. It is further

ORDERED, ADJUDGED AND DECREED that the Objection to Claim # 127 filed by the Debtor is hereby sustained and Claim # 127 is hereby disallowed. It is further

ORDERED, ADJUDGED AND DECREED that the Objection to Claim # 128 filed by the Debtor is hereby sustained and Claim # 128 is hereby disallowed. It is further

ORDERED, ADJUDGED AND DECREED that the Objection to Claim # 129 filed by the Debtor is hereby sustained and Claim # 128 is hereby disallowed. It is further

ORDERED, ADJUDGED AND DECREED that the Objection to Claim # 130 filed by the Debtor is hereby sustained and Claim # 130 is hereby disallowed. It is further

ORDERED, ADJUDGED AND DECREED that the Objection to Claim # 131 filed by the Debtor is hereby sustained and Claim # 131 is hereby disallowed. It is further

ORDERED, ADJUDGED AND DECREED that the Objection to Claim # 145 filed by the Debtor is hereby sustained and Claim # 145 is hereby disallowed.

DONE AND ORDERED.