**Richard G. PETITT and Jack Hirschhorn, individually and on behalf of all other similarly situated, Plaintiffs,**

v.

**CELEBRITY CRUISES, INC. and Does 1 through 5, Defendants.**

No. 98 Civ 4322 AGS.

United States District Court, S.D. New York.

March 28, 2001.

Raymond Fitzgerald, Butler, Fitzgerald & Potter, New York City, for Plaintiffs.

Gregory W. O'Neill, Martin Domb, Hill, Betts & Nash LLP, New York City, for Defendants.

## *OPINION AND ORDER*

SCHWARTZ, District Judge.

This putative class action was commenced by two passengers who traveled on a Caribbean cruise with their families between December 20, 1997 and December 27, 1997. During the cruise, both named plaintiffs and some members of their entourage became ill. Subsequent to their return to the United States, they brought claims against defendants for negligence, breach of contract, and deceptive acts or practices in violation of New York and Florida consumer protection laws. Currently before the Court are: (i) defendants' motion for summary judgment; (ii) defendants' motion to dismiss plaintiffs' consumer protection claims under Fed. R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") and Fed. R.Civ.P. 9(b) ("Rule 9(b)"); (iii) plaintiffs' motion for class certification; and (iv) plaintiffs' motion for a continuance to obtain additional discovery pursuant to Fed. R.Civ.P. 56(f) ("Rule 56(f)"). For the reasons set forth below, defendants' motions for summary judgment and to dismiss are granted, and plaintiffs' motions are denied.

## I. Factual Background [1]

## A. The Parties and the Holiday Cruise

Plaintiffs Richard G. Petitt ("Petitt") and Jack Hirschhorn are individuals who are residents of the State of Florida. (Amended Compl. ("Compl.") ¶¶ 1–2.) Defendant Celebrity Cruises, Inc. ("Celebrity") is a corporation organized and existing under the laws of the State of Dela-ware, and purportedly maintains an office and conducts business in New York. (*Id.* ¶¶ 3–5.) At all times relevant to this action, Celebrity operated, managed, maintained and/or controlled the cruise ships known as the Galaxy, Century, Horizon, Mercury, and Zenith. (*Id.* ¶ 7; Reply Declaration of Oscar Pla dated Jan. 4, 2000 ("Pla Rep. Decl.") ¶ 17, Ex. D.) Does 1 through 5, currently unknown to plaintiffs by name, are the owners or charterers of the above ships who are allegedly responsible for the injuries suffered by plaintiffs and the putative class members. (Compl. ¶¶ 8–9.)

Plaintiffs were passengers on a seven-day cruise on the Galaxy cruise ship, which departed from San Juan, Puerto Rico on December 20, 1997, stopped at several islands in the Caribbean Sea, and returned to San Juan on December 27, 1997 (the "Holiday Cruise").[2] (Celebrity Cruises, Inc.'s Rule 56.1 Statement ("Def.56.1") ¶ 1; Plaintiffs' Response to Defendant's Rule 56.1 Statement ("Pl.56.1") ¶ 1.) The Holiday Cruise had 1,934 passengers and approximately 880 crew members. (Def. 56.1 ¶¶ 90–91; Pl. 56.1 ¶¶ 90–91.)

## B. The Petitt Group and Their Travel to the Cruise

The Petitt Group of travelers included nine people: (1) Petitt; (2) Petitt's wife, Barbara Petitt ("Barbara"); (3) Petitt's father, Richard Petitt, Sr. ("Petitt Sr."); (4) Petitt's mother, Ruth Petitt; (5) Petitt's son, Craig Petitt ("Craig"); (6) Craig's fiancee, Colleen Nodes; (7) Petitt's other son, Brian Petitt ("Brian"); (8) Brian's fiancee, Lorraine Cantor ("Lorraine"); and (9) Petitt's daughter, Collen Petitt

---

1. The following facts are drawn from the record and are undisputed, unless otherwise noted.

2. The islands at which the ship stopped, aside from Puerto Rico, were the Dominican Republic, Barbados, Martinique, Antigua, and Saint Thomas.

("daughter Colleen"). (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.) On December 20, 1997, a limousine picked up all members of the Petitt Group except for Brian and Lorraine from Petitt's home in Stuart, Florida and drove them to Fort Lauderdale Airport. The limousine ride took about one-and-one-half hours. (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.) That same day, those seven members flew from Fort Lauderdale to San Juan on a Pan Am/Carnival Airlines flight, which was delayed for a considerable amount of time before take-off. The aircraft was completely full of passengers and only had a single aisle. (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.) Upon arrival at San Juan Airport, the seven members were led to a shuttle bus operated by Celebrity, which drove them to the pier along with other passengers. In the late afternoon or early evening, after presenting tickets to Celebrity personnel, they boarded the ship by means of a gangway, which had a handrail. (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.) The other two members of the Petitt Group, Brian and Lorraine, reside in New Jersey; they traveled to San Juan from a New York area airport on an American Airlines flight. They met the remaining members of the Group on board the Galaxy. (Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.)

The seven members of the Petitt Group who traveled from Florida did not receive, before the ship departed San Juan on December 20, the twelve pieces of luggage which they had checked with the airline in Fort Lauderdale. Petitt made repeated inquiries concerning the missing luggage to Celebrity's on-board staff, and eventually learned that baggage handlers had removed their luggage, as well 15 pieces owned by other cruise passengers, from the plane before take-off in Fort Lauderdale because the aircraft was overweight. The Petitt Group's luggage was delivered to them on the morning of December 23, shortly after the ship had docked in Barba-

dos. (Def. 56.1 ¶ 15; Pl. 56.1 ¶ 15.) During the approximately three days that seven members of the Petitt Group did not have their luggage, they coped with the situation in various ways, including:

(i) Brian and Lorraine, who received their luggage timely, shared their belongings. Lorraine testified that she shared "my underwear, all my clothes. I offered anything to help," including "combs, brushes, toothbrushes, and things of that nature." Brian testified that he loaned a shirt and socks to his father, and loaned numerous items to Craig, who is the same size;

(ii) For a "formal dinner" on December 22, the men borrowed tuxedos and the women borrowed dresses from Celebrity crew members;

(iii) Celebrity gave each passenger who lost luggage a credit of $50 to spend in the Galaxy's shops, and gave each an extra-large T-shirt to use as pajamas;

(iv) At least some of the seven washed their underwear or other clothing and hung them out to dry overnight. (Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.)

## C. The Petitt Group's Daily Activities While on the Cruise

### 1. Evening of December 20

On the evening of December 20, 1997, all nine members of the Petitt Group ate dinner together. They also had dinner together each subsequent night during the cruise, with the following exceptions: (i) on December 23, Barbara left dinner early because she was not feeling well; (ii) on December 25, Petitt Sr. left dinner early because he was not feeling well; and (iii) on December 26, Petitt Sr., and possibly Ruth Petitt, did not attend dinner because

Petitt Sr. was not feeling well.[3] (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.) After dinner, Craig and Colleen Nodes went to the ship's casino; they both enjoy playing craps and blackjack in particular. (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.)

## 2. December 21

On December 21, 1997, the two older couples—Petitt, Barbara, Petitt Sr., and Ruth Petitt—ate breakfast together; the five younger members of the Petitt Group slept later and had brunch, probably together. This was the usual pattern for breakfast or brunch throughout the cruise. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23.) That day, the ship stopped near a private island off the coast of the Dominican Republic. All nine members of the Petitt Group ate a buffet lunch on the island; then the five younger members took a ferry to the mainland of the Dominican Republic where they went on a long horseback riding excursion. (Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24.) Later that evening, all members of the group except Brian and Lorraine attended a show in the ship's theater, which was crowded. The entire Petitt Group then subsequently went to the casino, which was also crowded; at least Craig and Brian played craps. (Def. 56.1 ¶¶ 25–26; Pl. 56.1 ¶¶ 25–26.)

## 3. December 22

On December 22, 1997, the Galaxy was at sea. Petitt and Craig did some skeet shooting off the stern of the ship, using a rifle supplied by the ship and used by other passengers. Craig played basketball with other passengers who were not part of the Petitt Group. He also played shuffleboard once or twice during the cruise, with other members of the Petitt Group, but cannot recall on what days. In the afternoon, some members of the Group sat near the ship's pool; the pool area was extremely crowded and it was difficult to find a chair. Barbara began to feel ill that afternoon. (Def. 56.1 ¶¶ 27–29; Pl. 56.1 ¶¶ 27–29.)

After dinner that evening, the entire Petitt Group, with the possible exception of Brian and Lorraine, attended a show in the theater, which was crowded. At least six members of the Group—Craig, Colleen Nodes, Brian, Lorraine, Petitt and Barbara—then went to the casino, which was crowded. Craig, Colleen Nodes and Brian played craps for approximately two hours; as is common in craps, they both rolled the dice themselves and bet on other players' rolls. (Def. 56.1 ¶¶ 29–31; Pl. 56.1 ¶¶ 29–31.)

## 4. December 23

On December 23, 1997, the ship was docked at Barbados. Petitt and his parents went on a shore excursion, but Barbara did not go because she was not feeling well. Craig, Colleen Nodes, Brian and Lorraine went shopping and ate lunch on the island, and Petitt took daughter Colleen shopping in the afternoon in downtown Barbados. (Def. 56.1 ¶¶ 32–34; Pl. 56.1 ¶¶ 32–34.) After dinner that evening, Craig, Colleen Nodes, Brian, Lorraine, and Petitt went to the casino; Craig played blackjack and craps, and Petitt joined him for craps at one point. (Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35.)

## 5. December 24

On December 24, 1997, the Galaxy was docked at Martinique. Petitt rented a van with driver which took all nine members of the Petitt Group on a tour of the island, which lasted approximately five hours total. They were "pretty much packed" into the van. The Group had lunch together at

---

3. The illnesses of members of the Petitt Group are described further, *infra.*

a restaurant on the beach at or next to a Club Med resort; some members of the Group went swimming. On the way back to the ship, Brian and Lorraine did some shopping in downtown Martinique. While they were there, a man came up behind Brian, pushed him, and stole a gold chain from Brian's neck. Brian tried to report the incident to the local police, but was unsuccessful because they did not speak English; instead, he reported the incident to crew members of the Galaxy. (Def. 56.1 ¶¶ 36–37; Pl. 56.1 ¶¶ 36–37.)

### 6. December 25

On December 25, 1997, Christmas Day, the Galaxy was docked at Antigua. Craig, Colleen Nodes, and daughter Colleen went onto the island; Colleen Nodes telephoned her parents from a public telephone on the island to wish them a Merry Christmas. Many other passengers used the island's public telephones because they were less expensive than the ship's phones, and there were lines of passengers waiting for them. (Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.) Brian and Lorraine went to a beach on Antigua, had lunch on the island, and returned to the Galaxy for dinner. Barbara, daughter Colleen, Petitt, and Ruth Petitt went shopping on the island. (Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40.)

### 7. December 26

On December 26, 1997, the ship was docked at St. Thomas. Petitt, Barbara, and Ruth Petitt shopped for a ring for Petitt Sr. to give to Ruth Petitt on their fiftieth wedding anniversary. Craig and Colleen Nodes walked around the island; they canceled a snorkeling trip because

they both had cold symptoms. Brian and Lorraine went shopping on the island. (Def. 56.1 ¶¶ 41–43; Pl. 56.1 ¶¶ 41–43.)

After dinner, Craig, Colleen Nodes, Brian, Lorraine, and daughter Colleen went to the casino, where at least Colleen Nodes played craps. The casino was crowded. Later that evening, the members of the Petitt Group packed their bags in preparation for the end of the cruise and their departure from the ship the next day. (Def. 56.1 ¶¶ 44–45; Pl. 56.1 ¶¶ 44–45.)

### 8. December 27

On December 27, 1997, the ship had returned to San Juan and was docked there. Brian and Lorraine left the ship before the others to catch their return flight to the New York area. The others stayed on the ship for more hours because they had a later flight and because Petitt Sr. was ill. (Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46.)

### D. The Petitt Group's Illnesses

During the Holiday Cruise, the Galaxy's on-board medical facility was staffed by two physicians and three nurses. According to the Galaxy's medical logs, between December 22 and 25, 1997, six of the nine members of the Petitt Group—Petitt, Barbara, Petitt Sr., Ruth Petitt, Craig, and daughter Colleen—became ill and were diagnosed by the ship's doctors as having an upper respiratory tract infection, or URTI.[4] Such an infection is common among the general population and is akin to the common cold. *See* Scott F. Dowell, Benjamin Schwartz, and William R. Phillips, "Cough, Pharyngitis and the Common Cold," *in Am. Family Physician*, Oct. 15,

---

**4.** Barbara was diagnosed on December 23; Craig and daughter Colleen on December 24; and Petitt, Petitt Sr., and Ruth Petitt on December 25. (Def. 56.1 ¶ 47; Pl. 56.1 ¶ 47.) However, Barbara began to feel ill on December 22, and daughter Colleen stated to the

ship's doctor that her first symptoms had occurred three days earlier, on December 21. (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29; Declaration of Gregory O'Neill in Support of Celebrity's Motion for Summary Judgment dated Sept. 21, 1999 ("O'Neill Decl."), Ex. 32 at 7.)

1998 ("review[ing] appropriate therapy for bronchitis, pharyngitis and nonspecific upper respiratory tract infections (common colds)"), available in LEXIS, News Library, Arcnws File; Sherif B. Mossad, "Treatment of the common cold," *in British Med. J.*, July 4, 1998, at 23 (discussing treatments for URTIs as "cold remedies"), available in LEXIS, News Library, Arcnws File. All had similar symptoms, which included feeling achy and feverish, with a sore throat, chest congestion, runny nose, and headache. (Def. 56.1 ¶ 47; Pl. 56.1 ¶ 47.) Petitt Sr. was evaluated by ship doctors a second time after he fainted while leaving the ship's dining room on December 25, 1997; it was determined that he briefly lost consciousness, and a plan for observation by the family was recommended. (*Id.*)

Colleen Nodes was diagnosed with bronchitis, a viral infection related to an URTI and the common cold. *See* Tom Fahey, Nigel Stocks, and Toby Thomas, "Quantitative systematic review of randomised controlled trials comparing antibiotic with placebo for acute cough in adults," *in British Med. J.*, Mar. 21, 1998, at 906 (stating that "although the terms acute bronchitis, upper respiratory tract infection, common cold, and chest infection are used in a clinical context to define separate disease entities, they represent a range of respiratory tract infection"), available in LEXIS, News Library, Arcnws File; "Facts about antibiotics and respiratory infections," *in Wisc. State J.*, Mar. 20, 2001, at A7 (citing American College of Physicians–American Society of Internal Medicine, U.S. Centers for Disease Control and Prevention) (stating that bronchitis and the common cold fall within a larger subset of URTIs), available in LEXIS, News Library, Curnws File. Her symptoms were chest congestion and a dry cough. (Def. 56.1 ¶ 47; Pl. 56.1 ¶ 47.)

Neither Brian nor Lorraine was diagnosed as being ill by ship doctors. (*Id.*) Brian testified that, on the evening of December 24, he "felt like he had a cough coming on." However, after taking an over-the-counter cold medicine and going to sleep, he felt better the next morning. (Def. 56.1 ¶¶ 47–48; Pl. 56.1 ¶¶ 47–48.) Lorraine fell ill with stomach cramps, dizziness, and vomiting the day after she got home from the cruise, recovering within days; she did not have any respiratory problems and does not believe that she got sick because of the cruise. (Def. 56.1 ¶ 64; Pl. 56.1 ¶ 64.)

After the Holiday Cruise, only Petitt Sr. went to see a physician in connection with any symptoms or condition that arose during the cruise. He was examined by a neurologist, who found nothing wrong. (Def. 56.1 ¶¶ 57–58; Pl. 56.1 ¶¶ 57–58.)

## E. The Hirschhorn Group and Their Travel to the Cruise

The Hirschhorn Group of travelers included six people: (1) Hirschhorn; (2) Hirschhorn's wife, Ruth Hirschhorn; (3) Hirschhorn's son Peter Hirschhorn ("Peter"); (4) Peter's wife Laurie Hirschhorn; and (5) Peter's and Laurie's children, Samantha and Jeremy. (Def. 56.1 ¶ 67; Pl. 56.1 ¶ 67.)

Hirschhorn and his wife flew from Fort Lauderdale to San Juan on the same Pan Am/Carnival flight taken by seven members of the Petitt Group. Like Brian Petitt and his fiance, Peter Hirschhorn and his family flew to San Juan from a New York area airport, on an American Airlines flight. (Def. 56.1 ¶ 68; Pl. 56.1 ¶ 68.) As occurred with the Petitt Group, Hirschhorn's and his wife's four pieces of luggage were not aboard the flight from Florida; the missing luggage was delivered to them on December 24, when the ship was docked at Martinique. Between Decem-

ber 20 and 24, Hirschhorn and his wife did not have their daily medication, which had been packed in their luggage; Hirschhorn took medication for high blood pressure and cholesterol, and his wife took various medications. Hirschhorn and his wife also received $50 credit to use in the ship's stores. (Def. 56.1 ¶¶ 69–71; Pl. 56.1 ¶¶ 69–71.)

### F. Hirschhorn's and His Wife's Activities While on the Cruise

On December 23, 1997, while the ship was docked at Barbados, Hirschhorn and his wife walked around the island and in town for several hours. That night, which was the first night of Hanukkah, Hirschhorn took Jeremy to a candle lighting ceremony on the Galaxy. The ceremony was crowded. (Def. 56.1 ¶¶ 75–76; Pl. 56.1 ¶¶ 75–76.)

On December 24, 1997, while the ship was docked at Martinique, Hirschhorn and his wife walked around the island; when Hirschhorn began to feel ill, they returned to the ship. (Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77.)

### G. Hirschhorn's and His Wife's Illnesses

Hirschhorn was examined at the medical facility on December 25, 1997, after he complained of weakness, fever, cough, and chills. In his report, the doctor noted Hirschhorn's past medical history, which included hypertension, hyperlipidemia,[5] and swollen prostate. Hirschhorn was hospitalized. The doctor determined that he was suffering from a rapid heart rate and an increase in his white blood cell count; his heart rate and mental and mo-

tor condition only improved after certain medications were administered intravenously. The next day, December 26, 1997, the doctor determined that Hirschhorn was suffering from atrial fibrillation, with which Hirschhorn had been previously diagnosed. (Def. 56.1 ¶¶ 78–81; Pl. 56.1 ¶¶ 78–81.)

The doctor's overall diagnosis was (i) a transient ischemic attack ("TIA"), which is known as a passing or mini-stroke and involves decreased blood supply to an organ or body part, *see Williams v. Int'l Paper Co.,* 227 F.3d 706, 708 n. 1 (6th Cir.2000) (citing *Stedman's Medical Dictionary* 8, 100 (23rd ed.1976); Isselbacher et al., *Harrison's Principles of Internal Medicineu* 1922–23 (9th ed.1980)); *Sulkowska v. City of New York,* 129 F.Supp.2d 274, 304 n. 44 (S.D.N.Y.2001), (ii) URTI, and (iii) tachyarrhythmia, a form of irregular heartbeat. Hirschhorn was discharged on December 26, and advised to visit a physician as soon as possible after the cruise. (Def. 56.1 ¶ 81; Pl. 56.1 ¶ 81.) Hirschhorn visited a physician after the cruise, and "everything came through fine." His health is as good now as it was before the cruise.[6] (Def. 56.1 ¶ 85; Pl. 56.1 ¶ 85.)

In the late afternoon of December 25, 1997, Ruth Hirschhorn was also diagnosed with an URTI by the ship's doctors, after exhibiting symptoms of headache, runny nose, and sore throat. Peter, his wife, and children did not become ill on the Holiday Cruise. (Def. 56.1 ¶¶ 82, 84; Pl. 56.1 ¶¶ 82, 84.)

---

5. This condition involves elevated levels of lipid (or fat) protein in the blood. Ida G. Dox, Ph.D. et al., *Attorney's Illustrated Medical Dictionary* H40, L43 (1997).

6. The Court notes that the nature of Hirschhorn's illness was more severe than that of his

wife, discussed *infra,* or those of the members of the Petitt Group. Nevertheless, the parties consider him a member of the putative class, and the Court declines to disturb that conclusion.

## H. Cabin Arrangements, and Contact Among Family Members of Both Groups

The Petitt Group occupied four cabins, all on the same deck level, occupied by the following couples, respectively: Petitt and Barbara, Petitt Sr. and Ruth Petitt, Craig and Colleen Nodes, and Brian and Lorraine. Daughter Colleen did not have her own cabin; the Group arranged for her to spend alternating nights with either Craig and Colleen Nodes or Brian and Lorraine. (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.) Daughter Colleen spent the first night (December 20) with Craig and Colleen Nodes, and she alternated nights thereafter as described above until approximately midway through the cruise, when daughter Colleen, Craig and Colleen Nodes all had cold symptoms. From that point until the end of the cruise, daughter Colleen slept only in the cabin of Craig and Colleen Nodes. (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.)

The Petitt Group members had significant close contact among themselves throughout the cruise. Beyond their travel, touring, and sleeping arrangements, sharing of meals, and sharing of clothes and supplies as a result of the lost luggage, described *supra*, the members of the Petitt Group visited each other's cabins from time to time during the first three days of the cruise. (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.) They also are an affectionate family; Craig testified that he usually kisses his mother good night every night, and he probably kissed his grandmother (Ruth Petitt) good night a couple of nights during the cruise. Colleen Nodes has a warm relationship with all other members of the Petitt Group. She customarily kisses or shakes hands with her future in-laws, Petitt and Barbara. (Def. 56.1 ¶¶ 13–14; Pl. 56.1 ¶¶ 13–14.)

The Hirschhorn Group occupied two cabins, one for Hirschhorn and his wife and another for Peter and his family. Peter and his family visited Hirschhorn's cabin frequently throughout the cruise, and had considerable contact with Hirschhorn and his wife. (Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72.) All six members of the Hirschhorn Group had virtually all of their meals together during the cruise. They had dinner together on the first night of the cruise, December 20, and thereafter had all of their lunches and dinners together, except for the two nights that Hirschhorn spent in the ship's medical facility on December 24 and 25, accompanied by his wife Ruth. (Def. 56.1 ¶ 73; Pl. 56.1 ¶ 73.)

According to the Galaxy's medical logs, during the cruise immediately before and the cruise immediately after the Holiday Cruise, none of the passengers who occupied the cabins where members of the two Groups stayed was examined by ship doctors. (Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.)

## I. Incidence of URTIs Among Passengers and Crew During the Holiday Cruise

According to the Galaxy's medical logs, during the Holiday Cruise—from 2 p.m. on December 20 through 2 p.m. on December 27—a total of 64 passengers, including members of the Petitt and Hirschhorn Groups, and a total of 14 crew members visited the ship's medical facility and were diagnosed by ship doctors with cold or URTI symptoms. The 64 passengers represent 3.3 percent of the 1,934 passengers on the Holiday Cruise. The 14 crew members represent 1.6 percent of the approximately 880 crew members on the Holiday Cruise. (Def. 56.1 ¶¶ 92–94; Pl. 56.1 ¶¶ 92–94.)

The members of the Petitt Group do not know why they got sick during the cruise. (Def. 56.1 ¶¶ 59–63; Pl. 56.1 ¶¶ 59–63.) After the cruise, Petitt sent four letters to executives of Celebrity and Royal Caribbe-

an Cruise Lines ("Royal Caribbean"), with which Celebrity merged in December 1997, complaining about his experiences and those of his family during the cruise. Celebrity sent three letters in response. (O'Neill Decl., Exs. 22–28.) Hirschhorn does not know why he became ill during the cruise. (Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.) After the cruise, he wrote at least one letter to Celebrity, in which he complained about his experience on the cruise. (O'Neill Decl., Ex. 29.)

## J. Instant Action

Plaintiffs filed the instant action on June 19, 1998; an Amended Complaint was filed on July 23, 1999. They assert claims for: (i) negligence; (ii) breach of contract; and deceptive trade practices under (iii) New York and (iv) Florida consumer protection laws. The instant motions followed the close of discovery.

Celebrity's summary judgment motion is accompanied by two declarations prepared by a medical expert, Dr. Jack M. Gwaltney, Jr. ("Dr.Gwaltney"). (Declaration of Jack M. Gwaltney, Jr. dated Sept. 21, 1999 ("Gwaltney Decl."); Reply Declaration of Jack M. Gwaltney dated Jan. 5, 2000 ("Gwaltney Rep. Decl.").) Dr. Gwaltney is a professor of medicine at the University of Virginia School of Medicine, a position he has held since 1975. His area of specialization throughout his medical career has been upper respiratory tract infections, including the common cold, and since 1970 he has been Chief of the University of Virginia School of Medicine's Division of Epidemiology and Virology. He has held posts with various organizations concerned with infectious respiratory diseases, and has published numerous articles in the field of respiratory diseases, including articles on URTIs and the common cold. (Gwaltney Decl. ¶¶ 1–5.) His conclusions are based on his examination of the record, including the medical logs of the members of the Petitt and Hirschhorn Groups, his knowledge and experience concerning URTIs, and his familiarity with an extensive body of medical research and literature concerning the epidemiology, transmission, incidence, and prevention of URTIs. (*Id.* ¶¶ 13–14; Gwaltney Rep. Decl. ¶ 7, Exs. D–F.) The Court finds that his testimony concerning the issues involved in this case is admissible.[7]

Plaintiffs have not submitted any expert testimony in support of their position on any of the respective motions.

---

**7.** Plaintiffs have not made any objections to the admissibility of the declarations and testimony of Dr. Gwaltney, although they do take issue with certain of his conclusions. *See infra.* Fed.R.Evid. 702 ("Rule 702") authorizes expert testimony, including that of medical experts, providing that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact ..., a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 (as amended Dec. 1, 2000); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that Rule 702 imposes a spe-cial obligation upon a trial judge to ensure that scientific (including medical expert) testimony is not only relevant, but reliable.) The Court finds that Dr. Gwaltney's testimony is admissible; it is unquestionably relevant to the instant action, as his conclusions are both material and probative to the issues implicated by plaintiffs' negligence claim, particularly the issue of causation. His conclusions would clearly assist a jury in understanding the matters at issue. Further, given that (i) Dr. Gwaltney is an epidemiologist and a specialist on the common cold, (ii) his analysis is based upon extensive medical research in that area, data drawn from Celebrity's medical logs, and scientific data regarding the incidences of URTIs in the United States, and (iii) his conclusions are appropriately and logically justified by such sources, the Court finds that his testimony is also reliable.

## II. Discussion

### A. Summary Judgment Standard

A district court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences and ambiguities are resolved in the non-movant's favor. *See Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). However, the moving party does not bear the burden of proving that the non-movant's case is wholly frivolous. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rather, "in cases where the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim. Thus, the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Id.*

"Once the moving party has attacked whatever record evidence—if any—the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Celotex*, 477 U.S. at 333 n. 3, 106 S.Ct. 2548; *see also Brady*, 863 F.2d at 211 ("[W]here the moving party has attempted to demonstrate that the non-moving party's evidence is insufficient as a matter of law to establish his claim, the burden shifts to the nonmoving party to come forward with persuasive evidence that his claim is not 'implausible'.") (citation omitted). When reasonable minds could not differ as to the import of the proffered evidence, then summary judgment is proper. *See Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). Moreover, "conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).

### B. Plaintiffs' Negligence Claim

Plaintiffs' first claim alleges that the illnesses they suffered on the Holiday Cruise was caused by Celebrity's negligence. In particular, plaintiffs assert that Celebrity knew or should have known that certain conditions existed on the Holiday Cruise that would and did cause plaintiffs to become ill, and failed to advise plaintiffs of such conditions. Those conditions were: (i) allowing sick crew members, including food handlers, to continue working and/or continue living with other crew members in spite of the fact that they were suffering from URTIs, instead of declaring them unfit for duty, isolating them from other crew members, and requiring that they see a doctor; and (ii) failing to adequately clean and sanitize the cabins of passengers suffering from URTIs at the conclusion of each cruise, including plaintiffs' cabins. Plaintiffs further allege that such negligent acts or omissions constituted a violation of Celebrity's established policies and guidelines published by the United States Cen-

ters for Disease Control. Such acts also served, according to plaintiffs, to fill Celebrity's financial coffers; plaintiffs allege that "the medical facilities on board Celebrity ships were a profit center; the more passengers who were sick, the more money Celebrity and its medical staff made." As a result of such negligence, plaintiffs claim that they suffered "serious illness," which in turn required them to seek medical treatment, and suffer both emotional distress and economic loss. (Compl.¶¶ 33–52.)

### 1. Choice of Law

■ Plaintiffs' negligence claim is based on conduct that occurred on the high seas or in navigable waters, which resulted in injuries and damages suffered on the high seas. The Court finds that this claim falls within the Court's admiralty jurisdiction, and federal maritime law therefore applies.[8] A two-pronged test is used to determine whether a tort is "maritime" and thus within the admiralty jurisdiction of the federal courts, which the courts of this Circuit have referred to as "situs" and "status." *See Keene Corp. v. United States,* 700 F.2d 836, 843 (2d Cir.1983); *In re Horizon Cruises Litig.,* 101 F.Supp.2d 204, 207 (S.D.N.Y.2000). First, the Court must examine the situs or locality of the wrong: if the wrong occurred on navigable

waters, the action is within admiralty jurisdiction; if the wrong occurred on land, it is not. *See Horizon,* 101 F.Supp.2d at 207 (citing *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 253, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)). Second, the Court must determine whether the tort is "related to a traditional maritime activity." *See id.* According to the Supreme Court, this "status test" is based on two critical inquiries: whether the alleged wrong created a potential hazard to or disruption of maritime commerce and whether it arose out of an activity that bears a substantial relationship to traditional maritime activity.[9] *See Sisson v. Ruby,* 497 U.S. 358, 363–64, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990).

Personal injury claims by passengers on cruise lines and other ship passengers have routinely been subject to the court's admiralty jurisdiction. *See McDonough v. Celebrity Cruises,* 64 F. Supp.2d 259, 262 (S.D.N.Y.1999); *Horizon,* 101 F.Supp.2d at 208; *Friedman v. Cunard Line Ltd.,* 996 F.Supp. 303, 307 (S.D.N.Y.1998); *Johnson v. Commodore Cruise Lines, Ltd.,* No. 94 Civ. 191, 1996 WL 741606, at *1 (S.D.N.Y. Dec. 27, 1996); *Schwarze v. Ridan Inv. Trust, Inc.,* No. 89 Civ. 6730, 1991 WL 35874, at *2 (S.D.N.Y. Mar. 12, 1991). Applying the two-pronged test to

---

**8.** The Court notes that the conclusions in this Opinion would be the same whether the Court were to find that its jurisdiction lies in admiralty, or diversity. *See Victory Carriers, Inc. v. Law,* 404 U.S. 202, 204, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971) (stating that federal maritime law would apply whether the Court relies on diversity jurisdiction or admiralty jurisdiction); *Pope & Talbot v. Hawn,* 346 U.S. 406, 410–11, 74 S.Ct. 202, 98 L.Ed. 143 (1953) (applying federal maritime law to tort claim by carpenter who was injured on navigable waters while working on a ship, even where there was diversity jurisdiction); *but cf. Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641–642, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (stating that federal

common law developed under admiralty jurisdiction not freely transferable to diversity setting).

**9.** Whether the status requirement applies at all to a tort occurring on the high seas has not finally been decided. *See East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 863–64, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (declining to decide "whether a maritime nexus also must be established when a tort occurs on the high seas"). The Court nevertheless applies the "status test" to the facts of this case, and finds that it is met here.

the instant case, the result is no different. First, it is evident that Celebrity's alleged misconduct occurred on the high seas, notwithstanding the possibility that its alleged failure to sanitize the Galaxy's cabins may have occurred, in part, while the ship was docked. *Cf. Horizon,* 101 F.Supp.2d at 208 (finding that locality test was met even though passengers may have suffered injuries after they went ashore); Extension of Admiralty Jurisdiction Act, 46 App. U.S.C.A. § 740 ("The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.") Second, the status test is met here because, if plaintiffs' allegations are proved, Celebrity's actions created a hazard to or disruption of maritime commerce by causing a significant number of passengers and crew to become ill. Such illnesses could affect services on board, and future patronage of cruise ships, in particular those of Celebrity. Further, for Celebrity itself, such illnesses could result in the expenditure of additional funds as a result of additional sanitization requirements or the hiring of additional crew workers to ensure against a possible shortfall in the event of an outbreak of illness. Moreover, the activity in question arose from a traditional maritime activity, namely, the transportation of individuals via large passenger vessels. *See Friedman,* 996 F.Supp. at 307 (noting that "[o]pulent cruise ships have been part of the world's maritime tradition at least since the launching of Cleopatra's barge").

## 2. Plaintiffs Are Unable to Establish Causation

■ Under federal maritime law, a plaintiff sets forth a prima facie negligence claim if he establishes: (i) the existence of a duty owed by the defendant to the plaintiff; (ii) breach of that duty; (iii) proximate causation [10] of the plaintiff's injury; and (iv) damages. *See Dunn v. S. Charters, Inc.,* 539 F.Supp. 661, 670 (E.D.N.Y. 1982); Prosser & Keeton, *supra,* § 30 at 164–65.[11] Causation is an essential element of any negligence claim; if the plaintiff is unable to establish that his injuries were proximately caused by the defendant's conduct, summary judgment is proper. *See, e.g., Lawrence v. Sofamor, S.N.C.,* No. 95–CV–1507, 1999 WL 592689, at *6 (N.D.N.Y. Aug. 2, 1999) (granting summary judgment where plaintiff could not establish that defendants' per se negligence proximately caused plaintiff's injury

---

**10.** The common law often distinguishes cause-in-fact or "but-for" causation from legal, or proximate causation. But-for causation is the least rigorous standard and is described by Dean Prosser as follows: "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." W. Prosser & W.P. Keeton, *The Law of Torts* § 41 at 265 (5th ed.1984). Proximate cause is the cause that directly produces an event and without which the event would not have occurred. *Black's Law Dictionary* 213 (7th ed.1999). Thus, proximate cause is a more rigorous standard that includes cause-in-fact. Prosser & Keeton, *supra,* § 30 at 165.

**11.** The same test applies under the laws of New York and Florida, where the parties are domiciled. *See, e.g., Lenhoff v. Getty,* No. 97 Civ. 9458, 2000 WL 1230252, at *1 (S.D.N.Y. Aug. 30, 2000) (stating that elements of a negligence claim under New York law are (i) the existence of a duty flowing from defendant to plaintiff, (ii) a breach of this duty; (iii) a reasonably close causal connection between the act and the resulting injury; and (iv) damages.) (citing *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.,* 113 F.3d 296, 299 (2d Cir.1997)); *Lisanti v. City of Port Richey,* No. 2D00–1283, 2001 WL 166978, at *1 (Fla.2d Dist.Ct.App.2001) ("The elements for negligence are duty, breach, harm, and proximate cause.")

resulting from use of unapproved medical device on plaintiff); *Lopez v. S. Coatings, Inc.*, 580 So.2d 864, 865 (Fla.3d Dist.Ct. App.1991) (granting summary judgment where plaintiff was unable to prove that defendant manufacturer's failure to warm proximately caused his injury).

■ For the purposes of the summary judgment motion only, Celebrity concedes the first two elements of the test, namely that it failed to clean and/or sanitize its passenger cabins adequately and permitted certain of its crew members to remain on active duty despite being sick with URTIs, without isolating them or requiring that they visit a doctor. (Memorandum of Law in Support of Celebrity's Motion for Summary Judgment ("Def.Mem.") at 2–3.) Celebrity then argues that plaintiffs' negligence claim must be dismissed as a matter of law because plaintiffs are unable to establish that their injuries were caused by Celebrity's misconduct. (*Id.* at 2–4, 12–16.) Plaintiffs acknowledge that they "cannot prove that Celebrity's negligence was the only potential cause of [their] illnesses." (Plaintiffs' Memorandum of Law in Opposition to Celebrity's Motion for Summary Judgment ("Pl.Mem.") at 19.) However, they nevertheless assert that "on the balance of probabilities it seems a reasonable inference that Celebrity's negligence was the proximate cause." (*Id.* at 24.)

The Court disagrees. The Court finds, as Dr. Gwaltney concludes, that based on the record, a reasonable jury could not conclude that Celebrity's alleged misconduct was the proximate cause of plaintiffs' illnesses.

First, the Court notes that plaintiffs have not submitted any expert testimony in support of their opposition to Celebrity's motion, relying exclusively on their own observations, those of their family members, and the deposition testimony of certain former Celebrity crew members.[12] In contrast, Celebrity has offered the detailed and reasoned analysis of Dr. Gwaltney, who concludes, based on his review of the record and his experience in the field of epidemiology, that plaintiffs cannot establish by a preponderance of the evidence that their illnesses resulted from the actions of Celebrity.

Second, the record reflects that Barbara Petitt became ill on December 22, and that daughter Colleen stated that she began to experience cold symptoms on December 21, or three days before being seen by the doctor. According to Dr. Gwaltney, the incubation period for common colds and URTIs is one to six days, and on average between one and three days; thus it appears likely that both Barbara and daughter Colleen were exposed to the infection prior to boarding the ship. (Gwaltney Decl. ¶¶ 31–33.)

Third, both groups of plaintiffs had considerable close contact with each other, and with other passengers before and during the Holiday Cruise. Among the Petitt Group, as discussed *supra:* (i) the seven members who became ill made the one-and-one-half hour trip by limousine to Fort Lauderdale Airport, traveled to San Juan in a full, narrow-bodied aircraft which was delayed for a considerable time before take-off, and rode to the pier with other passengers in a shuttle bus; (ii) all members shared cabins, meals, clothes, other supplies, and various displays of affection with each other, and took a five-hour tour of Martinique together in a "packed" van; (iii) all members had direct contact with

---

**12.** The cited portions of the depositions of former Celebrity nurses and doctors, submitted in support of plaintiffs' motion, go to the issue of Celebrity's breach of duty, and to plaintiffs' class allegations, and not to the issue of causation. (Pl. Mem. at 10–16.)

other passengers aboard the ship in crowded places such as the theater and casino, or sitting by the pool, and on certain island excursions; and (iv) certain members had indirect contact with other passengers or island residents through physical objects that could have been infected by germs, such as the gangway of the ship, the craps dice in the casino, public telephones (such as the one Colleen used on Antigua), shuffleboard and basketball equipment, and the guns that Craig and Petitt used for skeet shooting, not to mention doorknobs, drawer handles, and other commonly touched objects. Hirschhorn and his wife Ruth had similar contact with passengers aboard the flight to San Juan, and indirect contact with the gangway and other commonly touched objects. Hirschhorn also had close contact with other passengers at the Hanukkah ceremony he attended on December 23.[13] The record reflects that plaintiffs and their families had less direct contact with members of the crew than with other passengers, although there was considerable opportunity for indirect contact in cabins, and at the restaurant and casino.[14]

Fourth, in their deposition testimony, plaintiffs and their family members conceded that they did not know how they contracted their illnesses. (Def. 56.1 ¶¶ 59–63, 86–87; Pl. 56.1 ¶¶ 59–63, 86–87.)

The record further reflects that neither plaintiffs nor their family members stated in their deposition testimony that they believed Celebrity was the cause of their illnesses.[15] Colleen Nodes believed that she caught something from Craig; Craig acknowledged coming into contact with passengers and touching items on which germs may have been present; Brian stated that he had no opinion as to the source of the virus or sickness; and Peter Hirschhorn stated that he did not know if Celebrity did anything to cause his father's illness, and stated that the stroke his father had "can be caused by anything and I don't think you can hold someone responsible for that." (Def. 56.1 ¶¶ 61–63, 87; Pl. 56.1 ¶¶ 61–63, 87.) Further, Petitt related that he was upset that the president of Celebrity did not personally respond to his letters, and suggested that he may not have commenced the lawsuit if the president had so responded. (Petitt Dep. at 191, Ex. 1 to O'Neill Decl. ("[H]ad [the president] picked up the phone, we probably wouldn't have been here [at Petitt's deposition] today.").) Hirschhorn testified that he did not blame Celebrity for his sickness during the cruise, only for the size of his medical bills and the fact that his luggage was misplaced.[16] (Hirschhorn Dep. at 64–65, Ex. 10 to O'Neill Decl.)

13. Gwaltney points out that those members of the Petitt and Hirschhorn Groups who did not travel on the Pan Am/Carnival flight did not fall ill. He states that this fact alone suggests that "other passengers on the airplane could have been the source of the URTI infection which attacked members of both groups." (Gwaltney Decl. ¶ 48.)

14. In this regard, Dr. Gwaltney states that "it is theoretically possible that one or more of the URTIs experienced by passengers on the Holiday Cruise were caused by infection transmitted to them by a sick crew member." However, based on the record before him, he could not conclude that the likelihood of such

cause was greater than 50 percent. (Gwaltney Decl. ¶ 56; Gwaltney Rep. Decl. ¶ 23.)

15. Plaintiffs state that Ruth Petitt blamed Celebrity for her family's illnesses, but the cited pages of her deposition testimony are not present in the record. (Pl. 56.1 ¶ 60.)

16. Although Hirschhorn asserts in his affidavit on the instant motion that Celebrity was responsible for his illness, (Affidavit of Jack Hirschhorn dated Dec. 1, 1999 ¶ 4), the Court declines to credit such statement. "It is well settled in this [C]ircuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion

Fifth, notwithstanding their allegation that the cabins were the cause of their illnesses because they were not properly sanitized between cruises, plaintiffs admit that none of the passengers assigned to those cabins in the cruises immediately before and after the Holiday Cruise sought medical attention at the ship's medical facility. (Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.) Moreover, as Dr. Gwaltney points out, the Hirschhorn grandchildren and their parents frequently made visits to Hirschhorn's cabin without becoming sick, which makes it unlikely that the cabin was a source of infection. (Gwaltney Decl. ¶¶ 52, 56.)

Sixth, plaintiffs attempt to raise an inference of causation by linking proximate cause to the number of sick passengers. Under plaintiffs' theory, "the more passengers aboard Celebrity's ships who were ill, the more likely that Celebrity's negligence caused their illnesses." [17] (Pl. Mem. at 18.) Once the number of ill passengers can be determined, which plaintiffs estimate to be in the "hundreds," it will be "possible to determine whether the URTIs contracted by the passengers for this period were

'more likely than not' caused by Celebrity's negligence in permitting sick crew members to remain on duty and in not properly sanitizing the guest cabins to prevent the spread of infection." [18] (*Id.* at 18–19.)

Plaintiffs' theory is both logically flawed and unsupported by the evidence. Given the close contact among the passengers—including the Petitt and Hirschhorn Groups—during the cruise, both among family members and, at certain locales such as the theater and casino, the wider vacationing community, the relative quantity of sick passengers is not likely to be probative of whether Celebrity caused plaintiffs' injuries. As Celebrity points out, it would be equally persuasive to argue that an increase in the number of sick passengers—beyond the small number calculated by Celebrity—may reflect that the passengers themselves brought the illness on board, and then spread it to other passengers and the crew. (Gwaltney Rep. Decl. ¶ 16.) Further, the objective evidence in the record suggests numerous possible causes.

for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citing *Miller v. International Tel. & Telegraph Corp.*, 755 F.2d 20, 24 (2d Cir.1985)).

17. Similarly, plaintiffs state that "if members of the Petitt party and Jack Hirschhorn were the only people on the ship who became ill, there would be a question whether Celebrity's negligence was the cause of their illnesses." (Pl. Mem. at 23.) This statement is misleading, because it implies that there is no question as to Celebrity's ultimate liability. But plaintiffs acknowledge that they cannot prove that Celebrity caused their illness and oppose Celebrity's motion on the ground that there is an issue of material fact for trial with regard to causation.

18. Plaintiffs state that the only way to "contact" passengers in order to find out who was ill is to certify the class. (Pl. Mem. at 2, 18

("Not until this class action is certified, and all the passengers contacted, can there be an accurate assessment of how many passengers became ill with URTIs.").) This contention is unavailing. As Celebrity points out, plaintiffs' desire to contact the thousands of other putative class members to ask them if they suffered from URTIs on the Holiday Cruise or subsequent Celebrity cruises over a certain period is tantamount to a concession that plaintiffs cannot presently substantiate their claims. A class should not be certified so that a plaintiff may obtain evidence from putative class members in order to substantiate his claims. *See, e.g., Vasiliow Co., Inc. v. Anheuser–Busch, Inc.*, 117 F.R.D. 345, 349 (E.D.N.Y.1987) (denying motion to certify class where plaintiff had not yet substantiated claims through discovery). The contacts that plaintiffs require to substantiate their claims could have, and should have, been made during the discovery period.

Even if the number of URTI cases was probative of causation, plaintiffs have failed to present any concrete evidence that the number of passengers was larger than that estimated by Celebrity. Plaintiffs do not dispute the accuracy of Celebrity's medical logs for the Holiday Cruise, which, as noted *supra*, show that 64 passengers and 14 crew members—3.3 percent of the nearly 2000 passengers and 1.6 percent of the nearly 900 crew members—were diagnosed with URTIs by ship doctors. While plaintiffs question the "statistical assumptions and convoluted conclusions" of Dr. Gwaltney that these percentages are considerably below the incidence of such illnesses in the overall population for the relevant time period, which he estimates to be 8.8 percent, plaintiffs provide no calculations of their own. (Gwaltney Decl. ¶¶ 15–23; Gwaltney Rep. Decl. ¶¶ 4, 6–7.) Dr. Gwaltney's uncontroverted finding that the incidences of URTIs on the ship were considerably below the national average suggests that plaintiffs' illnesses may not have been the unique or concentrated "outbreak" that they contend. (Pl. Mem. at 10; Affidavit of Richard G. Petitt dated Dec. 2, 1999 ("Petitt Aff.") ¶ 11; Affidavit of Barbara Petitt dated Dec. 2, 199 ("Barbara Aff.") ¶ 3; Reply Memorandum of Law in Support of Celebrity's Motion for Summary Judgment ("Def.Rep.") at 8–9.) However, plaintiffs contend that many more, specifically, "many hundreds" more passengers were affected. (Pl. Mem. at 2.) They state, without presenting any evidence in support, that receipts from sales at the Galaxy's gift shop from December 21 to 27 indicate that "at least 56 passengers purchased a range of over-the-counter medications—including decongestants, antihistamines, lozenges, cough drops, and Tylenol—which could be used to treat symptoms of URTIs." (Pl. Mem. at 6; Affirmation of Raymond Fitzgerald In Opposition to Motion for Summary Judgment ("Fitzgerald Aff.") ¶ 17.) Even assuming that each of these 56 passengers was different from each of the 64 passengers who was formally diagnosed with an URTI, that there were no repeat visits, that such items—in particular the lozenges, cough drops, and Tylenol—were purchased on account of illness, and if for illness, that the illnesses were similar to those suffered by plaintiffs, the total number of passengers with URTIs would total only 120.[19] This number represents approximately 6 percent of passengers, which would still be below the general average of 8.8 percent for the population during the relevant season of travel. (Gwaltney Aff. ¶ 23.)

Nevertheless, plaintiffs contend that the number of sick passengers will increase to "significantly more than 170" on the basis of evidence that has not been produced by Celebrity, namely, (i) receipts from gift shop sales during the first and last days of the Holiday Cruise, (ii) receipts from sales by the medical facility, (iii) information concerning those passengers who saw a nurse in the medical facility but not a doctor, (iv) information concerning visits by passengers to doctors, or their purchase of medication, on shore or after completing the cruise, as well as on the basis of (v) personal observations of the named

---

19. Celebrity has presented evidence to show that, during the entire Holiday Cruise, there were: (i) 33 purchases of cold/URTI medicine, cough syrup, decongestants and/or lozenges, by passengers not accounted for in the medical logs who were not repeat buyers; (ii) 22 purchases of Tylenol, aspirin, or other medications which are not necessarily associated with cold symptoms; and (c) more than 1600 purchases of other items (e.g., liquor, cigarettes, snacks, clothing, and gift items). (Def. Mem. at 3–4; Dobb Rep. Decl. ¶¶ 2–3, Exs. 51–52.) On this evidence, the total number of passengers with URTIs would be 97.

plaintiffs, their families, and Celebrity crew members.[20] (Pl. Mem. at 3, 6–7.) The Court addresses each of these items in turn.

First, with regard to gift shop sales, Celebrity asserts that (i) it has produced all receipts, and that (ii) the gift shop was closed on the first and last days of the cruise because the ship was in port. (Def. Rep. at 4; Pla Rep. Decl. ¶ 16.) Even if the gift shop was open and certain receipts were not provided, the number of purchases of medication on those two days would be unlikely to substantially increase the estimated number of sick passengers. The record reflects that the families of the named plaintiffs became sick between December 22 and 25, 1997, and none of these family members reported seeing other sick passengers or crew members prior to December 22. Moreover, the ship was docked in San Juan on both December 20 and 27; on the former date, passengers were gradually boarding and the ship did not depart until the evening; on the latter date, passengers were disembarking from the ship throughout the day to make their return trips home. The likelihood of any significant purchases of medication from the gift shop on either day was therefore minimal.

Second, Celebrity states that, despite substantial due diligence, it has been unable to locate the receipts of purchases by and charges to passengers at the medical facility. (Def. Rep. at 4; Declaration of Oscar Pla dated Dec. 2, 1999 ("Pla Decl.")

¶¶ 3, 6; Pla Rep. Decl. ¶¶ 5–15.) Plaintiffs suspect that such receipts may have been misplaced during or as a result of Celebrity's December 1997 merger with Royal Caribbean. (Pla Decl. ¶ 7; Pla Rep. Decl. ¶ 12.) Apparently, a summary of the information contained in the receipts was also stored on computer, but the pertinent files were lost as a result of file conversions associated with the merger. (Pla Decl. ¶ 8.) However, the mere absence of such receipts does not suggest that an appreciable number of passengers, beyond those examined by a doctor and those who purchased medication at the gift shop, purchased over-the-counter medication at the medical facility to treat URTIs or cold symptoms. Moreover, Dr. Gwaltney stated that, even allowing for a consequent increase in the number of passengers, the number would not reach into the "hundreds" as plaintiffs suggest, and thus would still be well within the incidence of such illnesses in the U.S. population. (Def. Mem. at 4–5; Gwaltney Decl. ¶ 24; Gwaltney Rep. Decl. ¶¶ 13–15.)

Third, there is no possibility of obtaining documentary evidence concerning those purportedly sick passengers who merely saw a nurse, or those who never even visited the medical facility; such records are simply not generated by Celebrity. The most reliable indicator of the identity of such individuals are the purchases of medication from the gift shop or the medical facility, which are addressed *supra*.[21]

---

**20.** The second of these items is also encompassed in plaintiffs' Rule 56(f) request, discussed *infra*.

**21.** In this regard, Dr. Gwaltney states that even assuming that "some crew members and passengers experienced cold and URTI symptoms during the Holiday Cruise but were not examined by a ship's doctor ... the incidence of cold and URTI illnesses among all crew members and passengers ... during the Holi-

day Cruise still would be well within the incidence of such illnesses estimated for the overall U.S. population." (Gwaltney Decl. ¶ 24.) He further states that for such numbers to reach the estimated U.S. average, 106 more passengers and 64 more crew members would have had to be sick. (*Id.* ¶¶ 25–26.) Dr. Gwaltney thus concludes that "the incidence of colds and URTIs among crew and passengers during the Holiday Cruise was no greater than, and probably was below, the

Such purchases would also be the best indicator of those passengers who may have purchased medication after the completion of the Holiday Cruise.

Further, even if plaintiffs were permitted, at this stage of the litigation, to contact Holiday Cruise passengers, there is no indication in the record that plaintiffs could proffer anything other than conclusory allegations that such individuals were allegedly sick with URTIs, did not see a doctor, and bought medicine from the medical facility, or from the gift shop on the first and last days of the cruise. *Cf. Luedke v. Delta Airlines,* 155 B.R. 327, 330–32 (S.D.N.Y.1993) (stating that subjective testimony as to whether an individual should be included in a class is inherently unreliable, and that the necessity of obtaining such testimony from potential class members could render the process of class certification administratively infeasible).

Fourth, the Court sees no reason to infer, based solely on plaintiffs' speculative assumptions, that sick passengers either made visits to doctors on shore at the Galaxy's ports-of-call, or purchased medication there. None of the members of the Petitt or Hirschhorn Groups purportedly made such visits or purchases, and the probability of such visits or purchases is low, given that passengers' time on the islands was limited and the probable difficulty of locating a pharmacy or a qualified doctor on the islands, especially those where English is not the primary language (e.g., Dominican Republic, Martinique).

Fifth, plaintiffs' assertion that "the testimony of the Petitt party, as well as one of the nurses aboard the ship, as bolstered by affidavits submitted in opposition to the pending motion for summary judgment, indicate that vast numbers of passengers and crew members were ill" is not reflected by the evidence. (Pl. Mem. at 23–24.) Plaintiffs present only conclusory assertions from members of the Petitt Group concerning an undetermined number of crew members and passengers who appeared to have cold or URTI symptoms.[22]

---

incidence of such illnesses in the U.S. population." (*Id.* ¶ 27.) Plaintiffs have presented no evidence on summary judgment to counter such conclusion, other than their own conclusory testimony, and that of their family members, that "many hundreds" of individuals were sick.

22. Petitt asserts that he personally observed "many sick passengers on the Galaxy who were coughing and sneezing ... walking through the passageways of the [ship]." (Petitt Aff. ¶ 9.) He also states that he observed "numerous passengers missing from their tables during dinner," at a time when "all passengers who were not ill would be expected to be at their tables." (*Id.* ¶ 10.) Petitt states that such passengers numbered "more than 100," and "since [he] could not be at all places on the ship at all times," he can "reasonably assert that there were hundreds of sick passengers who [he] did not observe." (Petitt Aff. ¶ 10; Pl. Mem. at 7–8.) Petitt concludes that Dr. Gwaltney must be mistaken because:

I have never seen such a widespread occurrence of such illness among any group of people, and I am certain that the outbreak of upper respiratory tract infections on the Holiday Cruise of the Galaxy was much greater than could ever have been expected in the general population.

(Petitt Aff. ¶ 11.) Barbara Petitt corroborates her husband's statements, using virtually identical language. (Barbara Petitt Aff. ¶ 3.) She further stated at her deposition that entire families were ill and she noticed that crew members disappeared for days. (Barbara Petitt Dep. at 13, Ex. 13 to Fitzgerald Aff.) The Court rejects Petitt's statement that a nurse told him that the cruise was the worst she had seen for sickness as inadmissible hearsay. (Petitt Dep. at 124, Ex. 7 to Fitzgerald Aff.)

Other members of the Petitt Group observed, at various points during the cruise: (i) an unspecified number of passengers in the hallways and passengers and crew members at the medical facility with cold symptoms (Colleen Nodes Dep. at 67, 72, 75, 78–79, 92,

Such assertions, without more, are not sufficient to demonstrate a factual basis from which an inference of causation may be drawn.

In granting Celebrity's motion in this case, the Court bears in mind that issues of negligence are generally not susceptible of resolution on summary judgment. *See, e.g., Aponte v. Trans World Airlines,* No. 94 Civ. 6337, 1996 WL 527339, at *2 (S.D.N.Y. Sept. 16, 1996) (citing *Havas v. Victory Paper Stock Co.,* 49 N.Y.2d 381, 388, 426 N.Y.S.2d 233, 402 N.E.2d 1136 (1980)) (stating that it is "particularly appropriate to leave [a finding of negligence] to the jury"); *Montauk Oil Transp. Corp. v. Steamship Mut. Underwriting Assoc.,* 859 F.Supp. 669 (S.D.N.Y.1994) (stating that "issues of negligence, causation, and knowledge frequently involve disputes of fact and are rarely appropriate for resolution on summary judgment"). However, "the mere fact that [a] case involves a claim of negligence does not preclude a granting of summary judgment." *McDonough,* 64 F.Supp.2d at 262 (S.D.N.Y.1999) (citation and internal quotations omitted). On summary judgment, "it is the function of the court to determine whether the evidence as to causation raises an issue as to which the jury may reasonably differ." Restatement (Second) of Torts § 434(1) (1965); *cf. Derickson v. Fidelity Life Assoc.,* 77 F.3d 263, 264 (8th Cir.1996) (stating that while causation is an issue for the trier of fact, "the court must determine ... whether the evidence authorizes submission of the case to the jury"); *Taylor v. United States,* 951 F.Supp. 298, 303 (D.N.H.1996) ("[W]hether proximate cause exists is issue for court to resolve; however, if court determines that evidence is such that a reasonable person could find legal fault or causation, issue is submitted to jury."); *Matthews v. Greyhound Lines, Inc.,* 882 F.Supp. 146, 148 (D.Ariz.1995) (while summary judgment is not ordinarily appropriate in negligence actions, it is appropriate where all reasonable people must draw the same conclusion.); *Detko v. McDonald's Restaurants,* 198 A.D.2d 208, 603 N.Y.S.2d 496, 498 (2d Dep't 1993) ("[T]he question of whether any act or omission of the McDonald's defendants was a proximate cause of the accident is an issue for the court to resolve."); *Kriz v. Schum,* 75 N.Y.2d 25, 34, 550 N.Y.S.2d 584, 549 N.E.2d 1155 (1989) (stating that legal causation is a determination left to the jury unless "only one conclusion may be drawn from the established facts").[23]

In this case, plaintiffs have not presented any concrete evidence that could lead a jury to conclude that their illnesses were

---

Ex. 11 to Fitzgerald Aff; Craig Petitt Dep. at 107, Ex. 10 to Fitzgerald Aff.; Brian Petitt Dep. at 45, Ex. 14 to Fitzgerald Aff.); and (ii) unidentified busboys, food handlers, wait staff, maids, and casino workers who apparently had cold symptoms (Colleen Nodes Dep. at 45–51, 86–87; Craig Petitt Dep. at 108, 110–114).

It should also be noted that Peter Hirschhorn stated that he did not notice, at any point during the cruise, that any waiter, busboy, maitre d' or wine steward was ill. (Peter Hirschhorn Dep. at 37, Ex. 11 to O'Neill Decl.)

**23.** In this regard, it is also noteworthy that as an outgrowth of the tort reform movement in Texas, the Texas Supreme Court has recently created the so-called "no-evidence motion," which applies to both negligence and other claims. The rule states that: "After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact." Tex. Civ. Pro.Code Ann. § 166(a)(i) (West's 2000).

due to Celebrity's negligence. This is not a case where the cause of an injury can be isolated to a single source, or even a handful of sources, as is often the case with negligence claims involving a defective product or an uncommon disease. *See, e.g., Horizon,* 101 F.Supp.2d at 209–10 (noting that defect causing cruise passengers to suffer from Legionnaire's disease originated in whirlpool spa); *Long v. Schmid Labs., Inc.,* No. 88 Civ. 5146, 1990 WL 119688, at *3 (S.D.N.Y. Aug. 6, 1990) (declining to award summary judgment in product liability case where plaintiff's expert testimony pinpointed the cause of plaintiff's injury to be an intrauterine device manufactured by defendants); *Siravo v. Ciba–Geigy, Inc.,* Civ. A. No. 90–1485, 1992 WL 136050, at *2 (E.D. Pa. June 4, 1992) (declining summary judgment despite the fact that plaintiff was unable to isolate the product that caused decedent's cancer, where a defined number of companies manufactured the product in question, and circumstantial evidence affirmatively linked defendants' product to decedent during the relevant period); *cf. Edmiston v. Tony Rome's, Inc.,* 224 A.D.2d 941, 637 N.Y.S.2d 896, 897 (4th Dep't 1996) (declining summary judgment in a food poisoning case where plaintiff's expert, a Ph.D. in toxicology, had "presented evidentiary proof in admissible form raising an issue of fact whether [defendant] served decedent unwholesome food that caused his fatal illness"). Here, during a winter Holiday Cruise, a certain number of passengers and crew members evidenced symptoms of a common respiratory infection. While far less severe from a medical perspective, the circumstances surrounding the alleged injuries in this case are more akin to toxic tort cases, where the germ or contaminant in question may originate from an indefinite number of sources. In such cases, causation is often difficult or impossible to establish, especially without admissible expert testimony. *See, e.g., Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 165 (3d Cir. 1999) (affirming grant of summary judgment where plaintiff had not established that volatile organic compounds (VOCs) emitted from new carpet installed in her home had caused her to suffer various respiratory problems); *Claar v. Burlington N.R.,* 29 F.3d 499, 502, 504 (9th Cir. 1994) (in an action where plaintiffs alleged that they were injured by exposure to toxic chemicals, and their experts neglected to investigate any other possible causes of the plaintiff's injuries, the court affirmed grant of summary judgment, holding that "coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method"); *Washington v. Armstrong World Indus., Inc.,* 839 F.2d 1121, 1123–24 (5th Cir.1988) (affirming grant of summary judgment where there was no evidence that asbestos manufactured by defendant was a factor in plaintiff's cancer, and plaintiff's only contradictory evidence was in the form of an affidavit of a physician who had never interviewed or treated plaintiff); *In re Agent Orange Prod. Liability Litig.,* 611 F.Supp. 1223, 1229 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987) (granting summary judgment based on plaintiffs' failure to establish causation for injuries allegedly resulting from exposure to Agent Orange, finding that none of plaintiff's expert evidence supported their claims for causation); *cf.* Ray Vaughan, "Liability for Dioxin Contamination," 25 *Am.Jur. Proof of Facts* 3d 473 (1994) (stating that proof of causation "can be extremely difficult in many toxic tort cases, especially where the injury is speculative," which often makes it difficult to obtain "sufficient expert testimony to survive a summary judgment motion"); James Pizzirusso, "Increased Risk, Fear of Disease and Medical Monitoring: Are Novel Damage Claims Enough to Overcome Causation Difficulties in Toxic

Torts?" 7 *Envtl. L.* 183 (2000) (noting, in the context of toxic tort cases, that courts "increasingly use summary judgment ... as ways to [dispose] of toxic tort cases before they reach a jury" and that when such cases go the jury, "plaintiffs' lawyers are then faced with the nearly impossible task of proving that their client's injury was caused by exposure to the defendant's product"). Construing all inferences and ambiguities in plaintiffs' favor, the Court finds that they have failed to submit any evidence that would lead a reasonable jury to conclude that their illnesses were caused by Celebrity's allegedly negligent acts and omissions. Accordingly, plaintiffs' negligence claim must be dismissed. *Cf. Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256–57 (7th Cir.1990) (granting summary judgment on negligence claim where "there is a dearth of evidence to support the plaintiff's case" and plaintiff "has not pointed us toward contradictory evidence as he must [on the issue of causation] to defeat the summary judgment motion").

## C. Plaintiffs' Rule 56(f) Request

In the event that the Court finds that there is no genuine issue of material fact, plaintiffs move, pursuant to Rule 56(f), for a continuance in order to conduct additional discovery that will enable them to adequately respond to Celebrity's summary judgment motion. (Pl. Mem. at 3; Fitzgerald Aff. ¶ 4.)

 Rule 56(f) requires the Court to ensure that parties have a reasonable opportunity to make their record complete before ruling on a motion for summary

judgment. *See Ursa Minor Ltd. v. Aon Fin. Prods., Inc.,* No. 00 Civ. 2474(AGS), 2000 WL 1010278, at *9 (S.D.N.Y. July 21, 2000) (citing *Sundsvallsbanken v. Fondmetal,* 624 F.Supp. 811, 814–15 (S.D.N.Y. 1985)). However, the rule is not a shield against all summary judgment motions. Litigants seeking relief under the rule must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative. *See id.* Specifically, the requesting party must file an affidavit demonstrating (i) the facts sought and how they will be obtained; (ii) how the facts sought are reasonably expected to create a genuine issue of material fact; (iii) efforts to obtain the facts previously; and (iv) why those efforts were unsuccessful. *See Sage Realty Corp. v. Ins. Co. of N. Am.,* 34 F.3d 124, 128 (2d Cir.1994); *Ursa Minor,* 2000 WL 1010278, at *9; *Arce v. Scully,* No. 93 Civ. 4970(AGS), 1998 WL 103181, at *3 (S.D.N.Y. Mar. 9, 1998).

[5] Without specifically addressing the above factors, plaintiffs assert that they require production of one of the categories of documents that they claim will provide evidence of additional sick passengers, namely, the information concerning the medication purchased by plaintiffs at the medical facility. Specifically, plaintiffs request all of the evidence concerning medications purchased by passengers on the Holiday Cruise, in particular, the "receipts of sales of medication by the Galaxy medical facility." [24] (Fitzgerald Aff. ¶ 14.) Such receipts, plaintiffs claim, constitute "the only evidence available with respect to patients suffering from URTIs who saw a nurse but not a doctor." [25] (*Id.* ¶ 18.)

---

**24.** To the extent plaintiffs' request also encompasses gift shop sales, such request is moot because a complete set of such receipts has already been provided. *See supra.* In any event, these documents would not create a genuine issue of material fact on causation,

because, as discussed *supra,* they would be unlikely to lead to an estimate of sick passengers that is significantly greater than Celebrity's current estimate.

**25.** Celebrity concedes that the receipts for charges to passengers at the Galaxy's medical

In their Rule 56(f) affidavit, plaintiffs state that they will be "prejudiced in their effort to respond to the summary judgment motion if they are unable to obtain complete information concerning the medication sold to passengers on the Holiday Cruise." (*Id.* ¶ 10.) In particular, they assert that without such information, they will be unable to discover "crucial evidence on the number of passengers who may actually have been ill with URTIs during the Holiday Cruise." (*Id.* ¶ 17.) Further, they assert that their failure to discover evidence as to the number of sick passengers has prevented them from retaining a medical expert in this case. Those experts whom they have consulted "are reluctant to offer an opinion on the cause of plaintiffs' illnesses, and the illnesses suffered by their family members on the Holiday Cruise in the absence of more complete information on the number of passengers who had the symptoms of the upper respiratory tract infections." (*Id.* ¶ 13.)

However, plaintiffs fail to explain how the requested documents will create an issue of material fact in order to defeat Celebrity's summary judgment motion. They merely assert, as they do in their opposition papers, that such evidence may indicate "the high incidence of upper respiratory tract infections on the Holiday Cruise," and thereby "give rise to a reasonable inference that such illnesses were caused, at least in part, by the frequency with which Galaxy crew members inappropriately remained on duty during the Holiday Cruise despite suffering from similar infections." (*Id.*) This argument is unavailing. First, as noted *supra,* the mere fact that more passengers were ill does not reasonably lead to an inference of causation by Celebrity. Second, even if it did, plaintiffs have set forth no facts that would indicate that the receipts in question would increase the number in such a sufficient way (e.g., above the general rate of the population) as to create a material issue as to cause. Moreover, Dr. Gwaltney's conclusion in this regard appears a logical one: Given the objective evidence of 64 diagnosed cases, plus 33 or so suspected cases based on the gift shop receipts, it would be unlikely that hundreds of additional passengers would have bought cold-related medications at the medical facility.[26] (Gwaltney Rep. Decl. ¶¶ 13–17.)

Because plaintiffs have not demonstrated that the subjects on which they propose to conduct discovery are reasonably likely

facility, as well as related computer files, were lost by Celebrity as a result of activity related to the company's merger with Royal Caribbean. (Pla Decl. ¶¶ 7–8.) Nevertheless, plaintiffs have insisted, on several occasions, that Celebrity provide the documents and/or an adequate explanation of exactly how they were lost, and have insinuated that Celebrity may have destroyed these documents after they were requested by plaintiffs. (Fitzgerald Aff. ¶¶ 6–10.) As part of their Rule 56(f) request, plaintiffs seek a "complete, good faith explanation of when and how any of such evidence was destroyed, and whether it was destroyed subsequent to the filing of plaintiffs' claims." (*Id.* ¶ 14.) The Court finds that the two declarations submitted by Celebrity's collections coordinator, Oscar Pla, provide a reasonable explanation for Celebrity's failure to produce the medical receipts in question, and

demonstrate that Celebrity made a significant and good faith effort to locate such receipts. (Pla Decl.; Pla Rep. Decl.). Accordingly, the Court declines to order a continuance on this ground.

**26.** Plaintiffs' argument that disclosure of additional documents will assist them in retaining an expert is inapposite to their Rule 56(f) request. Moreover, in this regard, Dr. Gwaltney concluded that "no medical expert could honestly reach the conclusion that the cold and URTI illnesses experienced by members of the Petitt and Hirschhorn Groups ... were more likely caused by their exposure to sick crew members or alleged unsanitary conditions aboard the ship, than by [other factors]." (Gwaltney Decl. ¶¶ 29, 56.)

to yield evidence that promises to overcome their failure to raise a genuine issue of fact as to causation, their application for relief under Rule 56(f) must be denied. *Cf. Ursa Minor*, 2000 WL 1010278, at *9 (denying defendants' Rule 56(f) request where the requested information, while potentially interesting to defendants, was not material to their defense); *Frankel v. ICD Holdings, S.A.*, 930 F.Supp. 54, 67 (S.D.N.Y.1996) (same); *see also Arce*, 1998 WL 103181, at *3.

### D. Plaintiffs' Breach of Contract Claim

Plaintiffs' second claim, for breach of contact, incorporates the allegations set forth in support of their negligence claim. Plaintiffs allege that "[d]efendant Celebrity breached its contracts with plaintiffs and the other Class members by failing to provide facilities, services and accommodations that were uncontaminated by conditions which caused illness to plaintiffs and the other members of the Class." (Compl.¶¶ 53–54.) However, plaintiffs neither point to a contract, nor a specific provision therein, that was allegedly breached by plaintiffs. Nor do they supply evidence of such a contract in their submissions on the motion. In essence, plaintiffs' breach of contract claim is no more than a restatement of their negligence claim, and on this ground, must be dismissed for the reasons outlined in the previous section.[27]

Even assuming that plaintiffs' breach of contract claim were distinct from their negligence claim and adequately alleged, the claim would still be subject to dismissal because plaintiffs have failed to establish that their damages, were caused by Celebrity's breach.[28] Under general principles of contract law, in order to prove a breach of contract claim, a plaintiff must establish that his damages were caused by the defendant's wrongful conduct. *See, e.g.*, E. Allan Farnsworth, Contracts § 12.1, at 841 (2d ed. 1990) ("There is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss, although the presence of other contributing causes may not preclude recovery."); *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 731 (2d Cir.1992) ("A plaintiff seeking damages for breach of contract ... must demonstrate that the damages were caused by and are directly traceable to the ... breach.") (citations and internal quotations omitted); *Am. Home Prods. v. CAMBR Co., Inc.*, No. 00 Civ.2021, 2001 WL 79903, at *4 (S.D.N.Y. Jan. 30, 2001) (stating that, under New

---

**27.** By failing to allege the existence of a specific contract and their performance thereof, plaintiffs have failed to sufficiently allege a contract claim, which also subjects such claim to dismissal under Rule 12(b)(6). *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir.2000) (noting that, under New York law, plaintiff must allege (i) the existence of a contract, (ii) performance of the contract by one party, (iii) breach by the other party, and (iv) damages); *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir.1999) (stating that under Florida law, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages"); *see also Florian Greenhouse, Inc. v. KOK Constr. Inc.*, No. 94–769–

CIV–T–17A, 1995 WL 611603 (M.D.Fla. Apr. 26, 1995) ("In order to properly state an action for breach of contract, the plaintiff need only allege the elements of the contract with precision.") (citing *Willard v. Miller*, 150 Fla. 458, 8 So.2d 489, 492 (1942) (en banc)).

**28.** In order to make such an assumption, the Court would first need to assume that the contracts at issue are the tickets purchased by plaintiffs. (Def. Mem. at 17.) A determination as to choice of law would be unnecessary here in light of the requirement in all relevant state laws that the alleged contract damages be caused by the defendant's misconduct.

York law, plaintiff must establish, *inter alia,* "damages suffered as a result of the breach"); *Jorgensen v. Century 21 Real Estate Corp.,* 217 A.D.2d 533, 629 N.Y.S.2d 268, 270 (2d Dep't 1995) ("[P]roximate cause is not an element of negligence only, but is also an element of breach of contract."); *Silver Springs O & G R. Co. v. Van Ness,* 45 Fla. 559, 34 So. 884 (1903) (en banc) (asserting as an "elementary principle of law" that damages award is the amount that naturally resulted from the breach of contract). Here, the. only damages plaintiffs assert are their illnesses, the charges they incurred in treating those illnesses, and associated emotional distress. (Compl.¶ 50.) The Court has already determined, in the context of plaintiffs' negligence claim, that plaintiffs are unable to establish that the illnesses resulted from Celebrity's alleged failure to properly sanitize cabins or remove sick crew members from active duty. Such finding dooms plaintiffs' contract claim here. Because plaintiffs have failed to raise an issue of material fact that would enable a reasonable jury to conclude that their injuries were sustained as a result of Celebrity's actions, their breach of contract claim must also be dismissed. *Cf. LNC Investments, Inc. v. First Fidelity Bank,* 173 F.3d 454, 464 (2d Cir.1999) (finding that bondholders who sought to recover damages to compensate them for injuries allegedly sustained as result of indenture trustees' imprudence were required to prove proximate cause as elements of liability with respect to their breach of contract claim); *Kennedy v. Syracuse Univ.,* No. 94–CV–269, 1995 WL 548710, at *4 (N.D.N.Y. Sept. 12, 1995) (dismissing breach of contract claim where, as with negligence claim, plaintiff failed to establish a material issue of fact existed as to causation, namely, that defendants' failure to have a trainer present at gymnastics practice caused plaintiff's injuries); *Weiner v. Hershman & Leicher, P.C.,* 248 A.D.2d 193, 669 N.Y.S.2d 583, 585 (1st Dep't 1998) (dismissing breach of contract claim in the legal malpractice context where the plaintiff could not establish that but for the negligence of the defendants, he would have prevailed on an appeal).

### E. Plaintiffs' Consumer Protection Claims

Plaintiffs' third and fourth claims allege that Celebrity made a series of false representations concerning the quality and sophistication of its services, in violation of the consumer protection laws of New York and Florida, in particular Section 349 of the New York General Business Law ("NYGBL") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq.* (Compl.¶¶ 55–67.) Plaintiffs allege that "Celebrity falsely represented to consumers, including residents of New York [Florida], that its ships were part of a 'world-class, premium rated' fleet which provided 'sophisticated' and 'five-star' services to its passengers." (*Id.* ¶¶ 57, 64.) Such representations were allegedly misleading, because Celebrity "permitt[ed] sick crew members on its cruise ships (including, in particular, food handlers) to remain on duty, and interact with passengers and fellow crew members, despite infectious and contagious diseases (including an inordinate number of upper respiratory tract infections) which rendered these crew members unfit for duty." (*Id.* ¶¶ 58, 65.) Because of such conduct, which was "contrary to Celebrity's representations to the public," plaintiffs assert that "Celebrity failed to advise the public of the unsafe and unhealthy conditions on its ships." (*Id.*)

■ Celebrity moves to dismiss both of these claims for failure to state a claim

under Rule 12(b)(6) or to plead fraud with particularity under Rule 9(b). While Rule 9(b) does not apply to such consumer protection claims, *see, e.g., Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000) (stating that a deceptive practice need not rise to the level of fraud to be actionable under Section 349); *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 55, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999) (stating that intent to defraud and justifiable reliance by the plaintiff, which are indeed elements of a fraud claim, are not elements of the statutory claim under Section 349); *Hedaya Bros., Inc. v. Fed. Ins. Co.,* 799 F.Supp. 13, 15 (E.D.N.Y.1992) ("Any allegation of fraud made in connection with [Section] 349 claim is surplusage and not subject to review under Rule 9(b)."); *Davis v. Powertel, Inc.,* 776 So.2d 971 (Fla.App. 1 Dist. 2000) (stating that plaintiff need not prove the elements of fraud to sustain an action under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA)); *Florida Software Sys., Inc. v. Columbia/HCA Healthcare Corp.,* 46 F.Supp.2d 1276, 1286 (M.D.Fla.1999) (judging sufficiency of

FDUTPA based on allegations' "specificity," rather than particularity under Rule 9(b)),[29] the Court nevertheless finds that these claims must be dismissed as a matter of law.

■ Section 349 "was designed to protect consumers from various forms of consumer fraud and deception." *Smith v. Triad Mfg. Group, Inc.,* 255 A.D.2d 962, 681 N.Y.S.2d 710, 712 (4th Dep't 1998) (citation omitted). The Section outlaws "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in [New York]." NYGBL § 349(a). While plaintiffs allege that Celebrity solicits business in New York and made false representations "to residents of the State of New York," (Compl.¶¶ 56, 57), they do not allege that Celebrity engaged in any activities declared unlawful by Section 349 *in New York.*[30] Moreover, there is nothing in the record that would enable the Court to draw such a conclusion: neither named plaintiff is a resident or domiciliary of New York, and plaintiffs do not allege that they either read the allegedly false promotional material in New York or purchased their

**29.** In an earlier Opinion, the Court declined plaintiffs' motion to strike Celebrity's affirmative defense under Rule 9(b) on the ground that plaintiffs' consumer protection claims sounded in fraud. (June 23, 1999 Opinion and Order at 6.) The Court declines to follow such finding here to the extent that it implied that Rule 9(b)'s pleading requirements apply to plaintiffs' consumer protection claims.

**30.** Plaintiffs statement in their opposition papers that only customers other than the named plaintiffs were solicited in New York "through deceptive trade practices" is (i) not reflected in the Complaint, and (ii) an admission that neither of the named plaintiffs may assert this claim, which, at least under one circuit court's view, would require dismissal. (Plaintiffs' Memorandum of Law in Opposition to Celebrity's Motion to Dismiss Expanded Class Allegations and Consumer Fraud Claims ("Pl.Mem.Dis.") at 20); *see Vuyanich*

*v. Republic Nat'l Bank of Dallas,* 723 F.2d 1195, 1201 (5th Cir.1984) ("Th[e] extension of the litigation to claims the named plaintiffs could not raise not only violates rudimentary principles of typicality, commonality, and standing but also creates such a legion of claims and defenses that sheer volume tends to obscure the valid rights of the proper classes and such rights as the members of improperly joined classes may be able to assert in another action.") Plaintiffs' reference to *Meachum v. Outdoor Corp.,* 235 A.D.2d 462, 652 N.Y.S.2d 749, 750 (2d Dep't 1997) is inapposite. In that case, the court merely allowed certain named plaintiffs to assert a Section 349 claim where defendants' deceptive acts were connected to New York. There was no indication that the plaintiffs had not been the subject of such misrepresentations, or that they were unable to assert the claim on their own.

cruise tickets in the state. Accordingly, plaintiffs' Section 349 claim must be dismissed.[31] *See Weaver v. Chrysler Corp.,* 172 F.R.D. 96, 100 (S.D.N.Y.1997) (dismissing Section 349 claim where plaintiff bought a Chrysler vehicle in California, and sued a New York based corporation on behalf of a putative class consisting of all purchasers of Chrysler vehicles with allegedly defective child seats, because plaintiff alleged no deceptive acts or practices occurring in New York); *see also Nardella v. Braff,* 621 F.Supp. 1170, 1173 (S.D.N.Y. 1985) (dismissing Section 349 claim because, *inter alia,* no conduct occurred in New York state); *Fava v. RRI, Inc.,* No. 96–CV–629 (RSP), 1997 WL 205336, at *4 (N.D.N.Y. Apr. 24, 1997) (reading the statute to proscribe deceptive acts and practices committed in New York).

■ Even if Celebrity's alleged misrepresentations occurred in New York, plaintiffs' Section 349 claim must be dismissed. In order to establish a Section 349 claim, a plaintiff must prove three elements: (i) that the challenged act or practice was consumer-oriented; (ii) that it was misleading in a material way; and (iii) that the plaintiff suffered injury as a result of the deceptive act or practice. *See Stutman,* 95 N.Y.2d at 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (citations omitted). The causation element is essential: "The plaintiff ... must show that the defendant's 'material deceptive act' caused the injury." *Id.* Here, as noted *supra,* the only injuries plaintiffs assert are their illnesses, the charges they incurred in treating those illnesses, and associated emotional distress. Neither the Complaint nor plaintiffs' submissions on Celebrity's motion to dismiss allege that plaintiffs suffered any other injuries as a result of the false repre-

sentations. The essence of plaintiffs' consumer protection claims, therefore, is that Celebrity's failure to advise plaintiffs of the conditions on the ships led, indirectly, to their illnesses and certain consequent damages. Because, as discussed *supra,* plaintiffs are unable to show that Celebrity's actions resulted in such injuries, directly or indirectly, plaintiffs' Section 349 claim is insufficient as a matter of law.

■ In their FDUTPA claim, plaintiffs allege that Celebrity violated Section 501.204, which provides in relevant part: "Unfair methods of competition, unconscionable acts or practices in the conduct of any trade or commerce are hereby declared unlawful." (*See* Compl. ¶ 66.) The FDUTPA is intended to protect consumers from unfair or deceptive acts or practices which diminish the value or worth of the goods or services purchased by the consumer. *Urling v. Helms Exterminators, Inc.,* 468 So.2d 451, 454 (1985). The FDUTPA provides that an "individual may recover actual damages, plus attorney's fees and court costs"; however, it limits the recovery of damages to those "related to the property which was the subject of the consumer transaction." Fla. Stat. §§ 501.211(2), 501.212(3). Moreover, claims grounded in personal injury are specifically excluded from the FDUTPA's ambit. Fla. Stat. § 501.212(3). In their opposition papers, plaintiffs state that Celebrity's alleged deceptive acts relate to their "conduct of soliciting and selling its cruise tickets"; but they acknowledge that the nature of the "shoddy service" was Celebrity's violation of its own policies, as well as the "policies of the Centers for Disease Control," which require them to advise passengers "of the unsafe, unhealthy conditions aboard the ship." (Pl.

---

**31.** The Court need not elaborate on the absurdity, from a policy perspective, of permitting non-New York residents to sue non-New York corporations in New York courts under a state consumer protection statute.

Mem. Dis. at 19.) As a result, plaintiffs "were exposed to crew members suffering from infectious and contagious upper respiratory tract infections." Therefore, plaintiffs conclude, all passengers who purchased [ ] tickets expecting a "premium-rated fleet" and "five-star service" were injured by Celebrity's misrepresentations. (*Id.* at 20.) Plaintiffs do not allege, either in the Complaint or in their motion papers, that they lost the economic value of their tickets; nor does the record reflect such losses. Rather, the only losses alleged as a result of the allegedly unhealthy conditions relate to the injuries suffered and costs incurred by plaintiffs as a result of becoming sick. Accordingly, because plaintiffs' allegations of deceptive acts and practices seek redress for their personal injuries, their FDUTPA claim must be dismissed.[32]

### F. Plaintiffs' Motion for Class Certification

Plaintiffs move for the Court to certify a class that includes all passengers who traveled on Celebrity's five cruise ships between December 10, 1997 and June 10, 1998, and who suffered from "upper respiratory problems" during and as a result of their cruise.[33] (Plaintiffs' Memorandum of Law in Support of Motion to Certify a Class of Plaintiffs at 1.) The time period encompasses the six months prior to the notice of claim served on behalf of the proposed class on June 10, 1998, as required by the tickets issued by Celebrity.

(*Id.* at 1–2.) Because the Court has found against the named plaintiffs on the merits, their motion for class certification must be denied. *See* Fed.R.Civ.P. 23(a) (requiring class action to include "claims . . . of representative parties"); *Board of Sch. Commissioners v. Jacobs,* 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (per curiam); *Comer v. Cisneros,* 37 F.3d 775, 798 (2d Cir.1994) (stating that "in general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot"); *Swan v. Stoneman,* 635 F.2d 97, 102 n. 6 (2d Cir.1980) ("As a general rule, a class action cannot be maintained unless there is a named plaintiff with a live controversy both at the time the complaint is filed and at the time the class is certified."); *In re Milk Prods. Antitrust Litig.,* 195 F.3d 430, 436 (8th Cir.1999) (denying class certification based on dismissal of named plaintiffs' claims on the merits); *Maywalt v. Auburn Tech.,* No. 94–CV–352 (RSP), 1996 WL 596547, at *9 (N.D.N.Y. Oct. 15, 1996) (citing *Floyd v. Bowen,* 833 F.2d 529, 534–35 (5th Cir. 1987)) (same).

### III. Conclusion

For the foregoing reasons, the Court (i) grants Celebrity's motion for summary judgment with respect to plaintiffs' negligence and breach of contract claims, (ii) denies plaintiffs' request for a continuance to conduct additional discovery, (iii) grants Celebrity's motion to dismiss plaintiffs' consumer protection claims, and (iv) denies

---

**32.** As with plaintiffs' claim under Section 349, there is an additional ground for dismissal of plaintiffs' FDUTPA claim. In order to prove that they suffered damages as a result of Celebrity's allegedly deceptive acts and practices, plaintiffs will have to establish that their injuries resulted from such practices. *See, e.g., In re Crown Auto Dealerships, Inc.,* 187 B.R. 1009, 1018 (Bkrycy.M.D.Fla.1995) (holding claimants entitled to no recovery under FDUTPA where they failed to establish

that they suffered actual damages as a result of the misrepresentations). Because plaintiffs are unable to establish such causation, *see supra,* their FDUTPA claim must fail as a matter of law.

**33.** The record reflects that there were 114 Celebrity cruises during this period. (Pla Rep. Decl., Ex. D.)

plaintiffs' motion for class certification. Accordingly, the action is dismissed. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.